Filed 11/9/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re KADENCE P., a Person Coming Under the Juvenile Court Law. | B262787 |
| | (Los Angeles County Super. Ct. No. DK05991) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SHAHIDA R. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Valerie Skeba, Juvenile Court Referee. Conditionally affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant Shahida R.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant Robert P.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Shahida R. and Robert P. appeal from the jurisdiction findings and disposition order declaring their infant daughter, Kadence P., a dependent of the juvenile court and removing her from their custody after the court sustained an amended petition pursuant to Welfare and Institutions Code section 300[1] alleging Shahida had untreated mental and emotional problems, a history of substance abuse and currently abused methamphetamine and marijuana, all of which rendered her incapable of providing regular care for Kadence; and Robert's recent violent assault of a female companion placed Kadence at risk of physical harm. Shahida contends the jurisdiction findings are not supported by substantial evidence. In addition, both Shahida and Robert contend the juvenile court failed to comply with the requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1900 et seq.) and join in each other's arguments directed to that issue on appeal. We remand the matter to allow the juvenile court to comply with ICWA and otherwise conditionally affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1 *Predetention Efforts To Avoid Intervention*

In August 2014 the Los Angeles County Department of Children and Family Services (Department) received a referral that Shahida was abusing illicit drugs when four-month-old Kadence was in her custody and had been inconsistent in taking the medication prescribed for her diagnosed bipolar disorder and anxiety. A Department social worker went to Shahida's home in Palmdale to investigate, but the apartment was empty; neighbors explained Shahida and Kadence had recently, and abruptly, moved. The Department finally located Shahida and Kadence in Nevada, where Shahida explained she had gone to meet the social worker assigned to her older children's dependency case, filed in Washoe County, Nevada in June 2012.[2] Shahida told the

---

[1]    Statutory references are to this code unless otherwise indicated.

[2]    Shahida's older children were removed from her custody on June 22, 2012 after the Washoe County Juvenile Court sustained allegations in a petition by the Washoe County Department of Social Services that Shahida, among other things, abused illicit

Department she had been clean and sober for more than two and one-half years and was in the process of reunifying with her older children, who had been placed with Shahida's sister in Los Angeles County in accordance with a Nevada juvenile court case plan. Shahida's social worker in Nevada confirmed Shahida had been compliant with her case plan during her pregnancy with Kadence and for several weeks after Kadence's birth, but appeared recently to have relapsed. She had not appeared at several drug tests, and the one time she did test the results were inconclusive due to a diluted sample. Shahida's sister similarly told the Department that Shahida appeared recently to be under the influence of illicit drugs when she visited the children.

Shahida denied using any drugs other than her prescribed medication for anxiety and depression. At the Department's request, on September 3, 2014 Shahida agreed to submit to a drug test; but staff at the testing center observed Shahida with some type of device and, as a result, deemed her test invalid. Shahida denied bringing a device with her. When asked by the staff at the testing center and the Department to retake the test, she became angry and refused. On September 23, 2014 Shahida brought Kadence to meet with Department social worker, who observed Kadence to be overall in good health. Afterward, however, Shahida failed to respond to the Department's multiple efforts to contact her to arrange for a team decisionmaking meeting and further drug testing.

2. *The Dependency Petition*

On October 27, 2014 the Department filed a petition under section 300 alleging Shahida had a long history of substance abuse, was a current abuser of methamphetamine and marijuana and her substance abuse had led to the removal of her three older children in ongoing dependency proceedings in Washoe County, Nevada. The petition also alleged that Shahida suffered from diagnosed and only intermittently treated bipolar disorder and anxiety and her emotional instability and substance abuse rendered her incapable of providing regular care for then six-month-old Kadence. A first amended

drugs and failed to obtain treatment for her mental health issues, placing her children at risk of harm.

3

petition, filed December 18, 2014, added the allegation that Robert had been arrested on October 17, 2014 for assaulting his female companion and brandishing a firearm, violent conduct that placed Kadence at risk of physical harm. Neither Shahida nor Robert appeared at the initial detention hearing. After concluding the Department had made a prima facie showing that Kadence was a person described by section 300, the court issued an arrest warrant for Shahida and a protective custody warrant for Kadence and ordered Kadence detained as soon as she was found. Shahida and Kadence were located in December 2014, and Kadence was immediately detained and placed with her paternal aunt.

3. *The Jurisdiction and Disposition Hearings*

At the March 10, 2015 jurisdiction hearing the Department presented evidence of Shahida's long history of substance abuse, the ongoing dependency proceedings in Nevada and her predetention failures to drug test. In addition, Shahida had failed to appear for multiple drug tests, including court-ordered tests, between December 2014 and March 2015 despite the court's and the Department's efforts to provide convenient test locations. The Department also reported that Shahida had appeared at a testing facility in Nevada in December 2014 in connection with her on-going dependency proceedings for her older children, but walked out after being told the test would be conducted using an oral swab, explaining she was not prepared to take that type of test. Shahida did appear at a testing facility in Tarzana on March 2, 2015 demanding to drug test, but, to her frustration, she was turned away. Social workers explained to her that random drug tests, by nature, cannot be scheduled at the election of the person required to test. At the time of the jurisdiction hearing, Shahida had failed to take a single drug test since the Department became involved in the case. The Department also reported that the juvenile court in Nevada had terminated reunification services due to Shahida's noncompliance with the case plan.

As to the allegations of her emotional instability, Shahida acknowledged to social workers she suffered from anxiety and depression, but denied it was untreated. She was under the care of a psychiatrist in Nevada who was treating her condition with

4

medication. Shahida explained she had run out of her medication, but said she had a scheduled appointment with her psychiatrist to obtain more and planned to go to urgent care in California if necessary.

The court sustained each of the allegations in the petition, explaining, "[T]he Department was trying to give her a chance. And I think it's not just that she wasn't cooperative. I have to think she was actively trying not to cooperate because if she had drug-tested that would have provided evidence. . . . [S]he was ordered by the Court in February to walk across the street and drug test. And she didn't do that. I mean that is completely, I think, indicative of her level of denial—well, denial of a problem or actual attempt to hide the problem. . . . So I think that given all of the circumstances in this case, the whole totality of the situation, her past history, her history of refusing to be tested, her current level of noncooperation with the Department, and her defiance of a court order, it's pretty significant evidence that I believe she's hiding, trying to hide the fact that she's still using drugs." The court also found Shahida suffered from mental and emotional problems that, coupled with her drug use, also put Kadence at risk of harm. The court declared Kadence a dependent child of the court, removed her from parental custody and ordered family reunification services for both parents.

3. *ICWA Findings*

Initially, Shahida denied any Indian ancestry and on September 3, 2014 completed a questionnaire to that effect. However, on December 18, 2014, at the initial hearing on the amended section 300 petition, Shahida indicated that Kadence may be a member or eligible for membership in the Blackfeet Indian Tribe.[3] The court ordered the Department to contact the maternal grandmother to confirm any Indian ancestry. On January 30, 2015 the maternal grandmother reported that her father's side of the family had Blackfeet Indian ancestry and recalled photographs of her father's ancestors in Indian dress. She explained the maternal great-grandfather had died nine years earlier and she

---

[3] The tribal names of "Blackfeet" and "Blackfoot" are used interchangeably in the record. We refer to the tribe as Blackfeet, as it is listed in the Federal Register. (See 80 Fed.Reg. 1943 (Jan. 14, 2015).)

5

lacked any additional knowledge of Indian ancestry. She said she would call her brother to obtain additional information.

On February 4, 2015 maternal grandmother reported that her brother, Ron Jones, had confirmed Creek Indian ancestry. Jones also told the Department directly that maternal great-great-great-great grandmother was "100 percent Creek" and maternal great-great-great grandmother was "'half white and half Seminole.'" He was unsure about any Blackfeet ancestry. The Department asked the court to advise which tribes should be noticed based on the information obtained.[4] On February 10, 2015 the court found the Department's information confusing as to Blackfeet ancestry.[5] The court continued the adjudication hearing and ordered the Department to reinterview the family.

Robert also had initially denied any Indian ancestry on December 18, 2014, but on February 10, 2015 indicated his grandmother may have been Cherokee. The court ordered the Department to address Robert's possible Indian ancestry in a supplemental report.

In a last-minute information for the court in connection with the March 10, 2015 jurisdiction hearing, the Department reported the maternal great uncle, after consulting with "senior relatives," had no further information about any Blackfeet ancestry. As to Robert's possible Indian ancestry, the paternal grandfather believed his mother—Kadence's paternal great-grandmother—was Cherokee, although he was not certain.

At the jurisdiction hearing, the court found Shahida's claim of possible Blackfeet ancestry could not be substantiated by any family member and, therefore, the court had

---

[4]     At the scheduled February 10, 2015 jurisdiction hearing, counsel for the Department suggested each of the identified tribes be provided notice of proceedings: "[T]hey just seemed to [identify] a lot of tribes, and I hesitate not to [provide] notice. If we're going to notice some, I think it's difficult and perhaps dangerous to not notice all of the tribes that they have mentioned."

[5]     "One of the problems is the way that the report is written, or the way that the interview is conducted. Maternal grandmother indicates Blackf[ee]t [and] pictures of ancestors with Indian garb, but then we don't find—there's no indication of who those relatives are" in the report.

6

no reason to know Kadence was an Indian child. The court did not expressly address information regarding her possible Seminole or Creek ancestry. As to Robert's claim of Indian ancestry, the court made a finding that, at this point, it had no reason to believe ICWA applied, but ordered the Department to provide notice to the Cherokee tribe. The court proceeded to adjudicate the petition, stating it would recall and retry the matter if it later obtained information, after notice to the Cherokee tribe, that ICWA applied.

## DISCUSSION

### 1. *Governing Law and Standard of Review*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.) Section 300, subdivision (b)(1), allows a child to be adjudged a dependent child of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court may consider past events in deciding whether a child currently needs the court's protection. (*Ibid.*) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; accord, *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

In addition, the Legislature has declared, "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment." (§ 300.2.) Exercise of dependency court jurisdiction under section 300, subdivision (b), is proper when a child is "of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] health and safety." (*In re Rocco M., supra*, 1 Cal.App.4th at p. 824; accord, *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1216.)

We review the juvenile court's jurisdiction findings and disposition order for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; *In re R.C.* (2012) 210 Cal.App.4th 930, 940.) Under this standard "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828; accord, *In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)

2. *The Court's Jurisdiction Finding Is Supported by Substantial Evidence*

Shahida contends the jurisdiction finding that Kadence was at substantial risk of harm is not supported by substantial evidence, insisting there was no evidence she had resumed using drugs and, even assuming she had, no evidence Kadence was actually at risk of any harm in her care. In fact, she asserts, Kadence was observed to be in overall good health.

Contrary to Shahida's contention, there was ample evidence she was hiding her current drug use. She avoided or refused to take drug tests; she provided diluted samples when she did appear at a facility to test; and one occasion tried to alter a test result. This is not a record devoid of evidence of drug use. As we have previously explained, a missed drug test, without adequate justification, is "properly considered the equivalent of a positive test result[.]" (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1217.) The

8

fact that Kadence has not yet been harmed by such use, without more, is not determinative. (*In re N.M., supra,* 197 Cal.App.4th at p. 165.) There was substantial evidence the continuous illicit drug use that had led to the removal of Shahida's older children was continuing and Kadence, an infant, was at substantial risk of harm. (See *Christopher R.,* at p. 1220 [a finding of substance abuse by a parent of a child under six years old is prima facie evidence of that parent's inability to provide regular care resulting in a substantial risk of harm]; *In re Drake M., supra,* 211 Cal.App.4th at p. 767 [same].)[6]

3. *Remand Is Necessary for the Juvenile Court To Comply with ICWA*

ICWA reflects a congressional determination that it is in the best interests of Indian children to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations. (25 U.S.C., § 1902; see *In re H.G.* (2015) 234 Cal.App.4th 906, 909-910; *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1355-1356; see also Welf & Inst. Code, § 224, subd. (a).)[7] It is intended to protect Indian children and to promote the stability and security of Indian tribes and families. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174; see also *In re Suzanna L.* (2002) 104 Cal.App.4th 223, 229.) For purposes of ICWA, an "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

---

[6]     In light of our affirmance of the juvenile court's finding Shahida's current substance abuse placed Kadence at substantial risk of harm, we need not address the alternative bases for jurisdiction, including the finding Shahida suffered from untreated mental illness or emotional instability that endangered Kadence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

[7]     "In 2006, with the passage of Senate Bill No. 678 (2005-2006 Reg. Sess.) (Senate Bill No. 678), the Legislature incorporated ICWA's requirements into California statutory law. (Stats. 2006, ch. 838, § 1, p. 6536.) The primary objective of Senate Bill No. 678 was to increase compliance with ICWA. . . . To accomplish this goal, Senate Bill No. 678 revised and recast several provisions of the Family, Probate, and Welfare and Institutions Codes." (*In re W.B.* (2012) 55 Cal.4th 30, 52.)

ICWA provides, "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a); see *In re S.B.* (2005) 130 Cal.App.4th 1148, 1157.) Similarly, California law requires notice to the Indian custodian and the Indian child's tribe in accordance with section 224.2, subdivision (a)(5), if the Department or court knows or has reason to know that an Indian child is involved in the proceedings. (§ 224.3, subd. (d).) The circumstances that may provide reason to know the child is an Indian child include, without limitation, when a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's parents, grandparents or great-grandparents are or were a member of a tribe. (§ 224.3, subd. (b)(1).)

Juvenile courts and child protective agencies have "'an affirmative and continuing duty'" to inquire whether a dependent child is or may be an Indian child. (*In re H.B.* (2008) 161 Cal.App.4th 115, 121; § 224.3; Cal. Rules of Court, rule 5.481.) As soon as practicable, the social worker is required to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; Cal. Rules of Court, rule 5.481(a)(4).)

Here, the juvenile court properly inquired about Shahida's Indian ancestry at each hearing, and the Department conscientiously interviewed several family members to obtain additional information. During these family interviews, the maternal great uncle informed the Department he had Creek and Seminole ancestry. The maternal grandmother also informed the Department she believed, based at least in part on photographs she no longer possessed, she had Blackfeet ancestry. The court found the

10

Blackfeet claim insufficiently supported and, according to the Department, the Creek and Seminole ancestry too remote.[8]

Neither explanation proffered by the court and the Department constitutes an adequate ground for failure to give notice of Kadence's dependency case to the identified tribes. As to the remoteness of Kadence's possible connection to the Seminole and Creek tribes, although the suggestion of Creek and Seminole ancestry was based on information about her great-great-great grandparents, nothing was presented to the juvenile court or included in the record on appeal concerning the membership rules for those tribes. It could well be, for example, that membership under tribal rules is passed to successive generations, as a matter of right, through bilineal or double descent without regard to intermarriage or blood quantum and that the absence of formal enrollment does not affect tribal membership. Under those circumstances Kadence could be an Indian child within the meaning of ICWA.[9] (See *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 21 [98 S.Ct. 1670, 56 L.Ed.2d 106 [Indian tribe is final arbiter of its membership rights]; *In re Francisco W.* (2006) 139 Cal.App.4th 695, 702 ["[t]he Indian tribe determines whether the child is an Indian child," and its determination is "conclusive"]; see also *In re B.H.* (2015) ___ Cal.App.4th ___ ["a person need not be a *registered* member of a tribe to be a member of a tribe—parents may be unsure or unknowledgeable of their own status as a member of a tribe"]; cf. *In re J.M.* (2012) 206 Cal.App.4th 375, 382 [failure to include information about great-great-great grandparents in the notice sent to the Tohono O'odham Nation, if error, was harmless in light of the tribe's own judicially noticed Constitution and membership criteria, which made clear that that such

---

[8]    It is the Department that suggests the ancestral relationship is too remote to support giving notice to the Creek and Seminole tribes; the record itself is silent on whether the court's failure to order notice to those tribes was deliberate or inadvertent.

[9]    As discussed, section 224.3, subdivision (b)(1), includes as a circumstance that may provide reason to know the child is an Indian child that one or more of the child's biological parents, grandparents or great-grandparents were or are members of a tribe. That provision neither limits the generations from which relevant information may be obtained nor creates a general "remoteness" exception to ICWA notice requirements.

attenuated relationship would not be sufficient to make child member of tribe]; *In re Shane G.*, *supra*, 166 Cal.App.4th at p. 1539 [although maternal grandmother indicated Shane's great-great-great-grandmother was a Comanche princess, notice was not required; "[m]ost significantly, the evidence before the court showed the Comanche tribe requires a minimum blood quantum for membership that exclude[d] Shane"].)[10]

As to Blackfeet ancestry, the maternal grandmother provided information based on photographs no longer in her possession that she had Blackfeet ancestry through her maternal grandfather. Her identification of the tribe and articulated basis for this belief made that claim more than simply family lore and, even without further substantiation, was sufficient to trigger notice under ICWA and state law. (*In re B.H. supra,* __Cal.App.4th at p. __ ["[F]ather specifically reported 'Cherokee' ancestry, through his own father. Though he was unable to provide any further information, this was sufficient to trigger ICWA"]; cf. *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467 [mother's inability to identify tribe or nation and failure to provide any contact information to

---

[10] In its recently adopted ICWA guidelines for state courts, the Bureau of Indian Affairs confirmed, "[¶] (a) only the Indian tribe(s) of which it is believed a biological parent or the child is a member or eligible for membership may make the determination whether the child is a member of the tribe(s), is eligible for membership in the tribe(s), or whether a biological parent of the child is a member of the tribe(s) or whether a biological parent of the child is a member of the tribe(s). [¶] (b) The determination by a tribe of whether a child is a member, is eligible for membership, or whether a biological parent is or is not a member of the tribe is solely within the jurisdiction and authority of the tribe." (U.S. Dept. of the Interior, Bureau of Indian Affairs, Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed.Reg. 10146, 10153 (Feb. 25, 2015) (BIA Guidelines).) The BIA Guidelines also explain in Section B.3(c)(1) that there is no requirement within ICWA that the child "maintain a certain degree of contacts with the tribe or for a certain blood quantum or degree of Indian blood," (*ibid.*) and that "[i]n some tribes, formal enrollment is not required for tribal membership." (Section B.3(c)(2).)

Although not binding on state courts, the BIA Guidelines are "instructive." (See *In re W.B., supra,* 55 Cal.4th at p. 50, fn. 9; see also *In re Louis S.* (2004) 117 Cal.App.4th 622, 629 [discussing earlier iteration of BIA Guidelines, "[a]lthough the Guidelines are not binding on state courts, this court has found the Guidelines to be persuasive with regard to the ICWA notice requirements"].)

12

substantiate her unsupported belief insufficient to invoke ICWA; family lore alone is insufficient to give court reason to know a child is an Indian child]; *In re O.K.* (2003) 106 Cal.App.4th 152, 160 [grandmother's statement that minor "'may have Indian in him,'" without more, insufficient to invoke ICWA notice requirements].)

Robert contends the court also erred in adjudicating the petition and making its disposition order before giving notice to the Cherokee tribe and waiting the requisite time for the tribe to respond. (See 25 U.S.C. § 1912(a) ["[n]o foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary"]; Cal. Rules of Court, rule 5.482.) We agree the disposition of the case was premature without first noticing the Cherokee tribe, even though Kadence was ultimately placed with a relative and not in foster care. (See 25 U.S.C. § 1912(a); *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 700 [placement of child with noncustodial parent did not cure ICWA violation; the "issue of possible foster care placement was squarely before the juvenile court" at disposition hearing].)[11] Nonetheless, because notice to the Cherokee tribe has since been provided,[12] the issue as to the fact (as distinguished from the content) of the notice is moot and remand to order notice to the Cherokee tribe unnecessary.

In sum, because the juvenile court failed to comply with the requirements of ICWA, the disposition order may only be conditionally affirmed. A limited remand is required. Upon remand the juvenile court shall direct the Department to send ICWA notice to the Blackfeet, Creek and Seminole tribes in accordance with ICWA and California law. The Department shall thereafter notify the court of its actions and file certified mail, return receipts for any ICWA notices that were sent together with any

---

[11] The juvenile court also recognized the problem when, upon deciding to proceed with the jurisdiction hearing, it indicated it would recall and retry the matter if information was obtained following notice that Kadence is an Indian child.

[12] On August 21, 2015 we granted the Department's request for judicial notice of the post-disposition notices of dependency proceedings sent to the Cherokee tribe on March 18, 2015. (Evid. Code, §§ 459, 452.)

13

responses received.  The court shall then determine whether the ICWA inquiry and notice requirements have been satisfied and whether Kadence is an Indian child.  If the court finds Kadence is an Indian child, it shall conduct a new disposition hearing, as well as all further proceedings, in compliance with ICWA and related California law.

## DISPOSITION

The matter is remanded for compliance with ICWA and related California law as provided above.  In all other respects, the jurisdiction findings and disposition order is affirmed.


                                                PERLUSS, P. J.


We concur:



        ZELON, J.



        BECKLOFF, J.[*]

_____

[*]        Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.