Filed 10/19/20  In re R.W. CA4/3

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.W., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>K.A.,<br><br>     Defendant and Appellant. | G058884<br><br>(Super. Ct. No. 18DP1054)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

\*          \*          \*

K.A. (mother) appeals from an order terminating reunification services at the 12-month review hearing. One-year-old R.W. was detained because of mother's serious drug-abuse and mental-health problems. Though in the visitations it appeared mother was bonded to her child, and her child to her, she made almost no progress on her drug and mental health problems. The court found there was not a substantial probability that R.W. would be returned to mother by the 18-month review hearing and terminated reunification services. Importantly, mother does not challenge that finding on appeal.

Instead, mother contends the court abused its discretion because it extended another six months of services for S.W. (father), who had made substantial progress on his case plan, yet cut her services off. There was no abuse of discretion. A court is not required to treat the parents as one unit. Mother had shown no serious effort at reform. Father had. The two were estranged from each other. And there was little chance further services would have made any difference to mother. Accordingly, we affirm.

FACTS

This appeal concerns R.W., who was one year old at the time of detention. R.W. has two half siblings who are not subjects of this appeal. Father is the biological father of R.W. The two half siblings consider father their stepfather. Mother and father were not married, and their relationship had broken down to the point that, early in the dependency proceeding, a restraining order from a criminal court prevented the two from seeing each other, except to peacefully transfer the children to one another.

*Detention*

Mother has an extensive history of methamphetamine abuse and a related criminal history, which includes court-ordered substance abuse treatment. She had been

2

arrested twice for driving under the influence of methamphetamine. Mother had enrolled in a drug rehabilitation program three times, in each case after she became pregnant.

Her most recent relapse began around December 2017, which is when father found methamphetamine in mother's glove compartment (for point of reference, the detention occurred in October 2018). Father observed that mother's drug abuse and mental health issues had substantially escalated in August and September of 2018, culminating in an incident where mother, apparently out of a paranoid fear that father would kill her, planted drugs and drug paraphernalia in father's car, then called 911 in an attempt to frame him.

On September 17, 2018, mother was placed on a three-day involuntary psychiatric hold after abusing methamphetamine. She had been experiencing hallucinations and paranoia. She would wake the children up in the middle of the night and drive them to a motel or to a friend's house because she thought the house was not safe.[1] This behavior continued through the days preceding the detention. Mother refused to sleep at home, fearing there were people in the attic out to get her, and instead bounced back and forth between hotels and friends' houses with the children. This involved driving around with the children as late as 1:00 a.m. The 10-year-old sibling reported she was not happy because she did not know where she would be sleeping each night. Father ignored them; mother was hearing voices.

Prior to the detention of R.W., the maternal grandmother told the assigned social worker that mother's substance abuse and mental health were getting worse. The maternal grandmother was frustrated and concerned for the children's lives. This sentiment was echoed by mother's friends. Mother's best friend told a social worker that she was concerned about the children because mother's paranoia and delusions had escalated in the previous four weeks. As reported by the social worker, the best friend

---

[1] This appeal concerns only R.W. although all three siblings were subject to the underlying petition.

3

"stated the mother 'continues to call me' and will say there is 'something in the backyard, someone running out of the house.'  [The friend] stated she can hear the mother screaming at the kids and she tells [her] there is no need to scream."  The friend described mother as "neurotic, frantic, and behaving with paranoid delusions."  She added, "nothing she says makes sense," and the mother cannot be believed."  Mother had showed up at the friend's house at 4:00 a.m. out of paranoid fear of her own home.

The maternal aunt had been living with mother the prior two years to ensure the children were cared for.  However, the maternal aunt was moving out due to mother's combativeness while high on methamphetamine.

R.W.'s 10-year-old sibling described their home as "sad."  She reported that her life has "never been quite normal."  However, she denied being abused or seeing domestic violence.  She generally confirmed mother's constant paranoia.  R.W.'s five-year old sibling also confirmed the late night escapes from the house to go either to a motel or to a friend's house.  She described her mother as "cuckoo."

By the beginning of October 2018, The Orange County Social Services Agency (SSA) had determined that the chaos of the children's home warranted detaining the children.[2]  It sought a protective custody warrant, which was granted.  Rather than turn the children over, however, mother grew angry and absconded with them.  She thought better of it a few days later and agreed to leave the children with a former caretaker.  The children were placed with the maternal grandparents.

*Jurisdiction/Disposition*

Mother denied she had any mental health problems, other than post-traumatic stress disorder, which she claimed was a result of an abusive relationship with

_____

[2]  Father was also experiencing substance abuse problems, though not to the same extent as mother.  He is not a party to this appeal, however, and thus is mentioned only where relevant to mother's appeal.

4

her late ex-husband (the father of the two half siblings).  While she admitted her history of methamphetamine use, she denied she had an unresolved problem, describing herself as "in recovery."  The social worker urged mother to begin a drug treatment program.  Mother demurred, however, stating that she could not afford to participate in an in-patient program, and that she had already completed out-patient programs.  She subsequently missed her intake interview for an out-patient program.  She finally started that process approximately a month and a half later.  She was also referred to random drug testing and was given instructions on where and how to test.  She missed her first eight tests.

Prior to the jurisdiction hearing, mother was arrested for possession of a weapon in a state or local public building (Pen. Code, § 171b, subd. (a)).  She pleaded guilty and was sentenced to 10 days in county jail.

Mother was offered visitation twice per week.  Her initial visitations generally went well, with the children enjoying the visit, though mother ended one visit early and showed a habit of speaking poorly of the children's caretakers in the presence of the children.  Mother also began harassing the caretaker via text messages and phone calls.  After approximately two months, the oldest child told the social worker that she felt uncomfortable with mother during the visits, though she did not elaborate on why.  The children were doing well in the care of the maternal grandmother.

SSA recommended offering mother reunification services, despite that, in its view, mother was not legally entitled to such services.[3]  The social worker elected to

---

[3]  The social worker who authored the jurisdiction/disposition report expressed the view that Welfare and Institutions Code section 361.5, subdivision (b)(13) applied, which permits a court to bypass reunification services under the following conditions:  "That the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

recommend reunification services because the children were bonded to mother, mother had previously shown an ability to achieve long-term sobriety, there were no prior child-abuse referrals, and mother's relapse may have been triggered by the death of her ex-husband.

In December 2018, the court found the allegations of the petition to be true and declared R.W. a dependent of the court. The court adopted all of the recommendations of SSA, adding only that mother's drug testing be independent of her counseling, and that her counseling address the issues of domestic violence and her absconding with the children.

*First Reunification Period: January 2019 – June 2019*

Mother's case plan required her to participate in the following services: "Psychiatric/Psychological Evaluation, Psychotropic Medication Evaluation and/or Monitoring, General Counseling, Parenting Education Program, Substance Abuse Testing, 12-Step Program, Substance Abuse Treatment." The social worker described mother's progress on her case plan during this period as minimal.

Regarding mother's required mental health treatment, she made no progress. Mother continued to deny she had any problems. She blamed everything on domestic violence, or on the maternal grandmother orchestrating a scheme of harassment against her. She asserted she was hospitalized for no reason. The Orange County Health Care Agency denied her specialized services, stating such services are not likely to help "due to [mother's] intake indicating denial of all major symptoms, behaviors, and impairments related to mental health." Mother made no further effort to follow up.

Regarding general counseling, mother did not return the calls or respond to letters sent to her from her initial referral, and thus, three months into the first reunification period, the initial referral was terminated. She finally got into counseling approximately five months into the first reunification period. Her attendance was good,

and she was cooperative. However, mother was not acknowledging her own fault in causing the dependency proceeding. After the first six months she had attended a total of five sessions.

Mother made no progress on attending a parenting education class.

Mother was scheduled for 27 random drug tests during the six-month period. She had six negative tests, one test positive for methamphetamine, 19 missed tests, and one inability to provide a sample. She also drug tested through her perinatal program, which she attended for approximately three months. Through that program she tested negative twice, failed to appear 12 times, had four tests that were "adulterated/tampered/diluted," was unable to provide a sample twice, and tested positive for methamphetamine twice (once in February and another time in March). She came up with farfetched excuses for her positive tests, such as that she must have been exposed second-hand at a bus stop, or, in one case that she randomly found a crack pipe in her pillow case at a motel.

The counselor at the perinatal program reported that mother was "struggling" and recommended an inpatient drug treatment program, to which mother falsely responded that the social worker was opposed to it (the social worker had, in fact, recommended it). Mother later explained she resisted an inpatient program because she did not want it to appear she was "jumping around" between different treatment programs. She eventually entered an in-patient drug rehabilitation program at the end of April 2019. She was kicked out four days later. The reason is not entirely clear in the record, but it appears she was attempting to take unauthorized pain medication and otherwise had medical issues that precluded her participation in the in-patient program. She did not reenroll in any sort of drug treatment program in the remainder of the first reunification period. She attended 12-step meetings with some regularity but never found a consistent sponsor.

In March 2019, mother threatened to kill the maternal grandmother if she relinquished R.W. to a different family. A couple of months later, mother trespassed onto the maternal grandmother's property and, during a nightly phone call with the eldest sibling, asked for a plate of food, complaining that she was starving. The eldest sibling took out a plate of food. The maternal grandmother was unaware of this until after the fact.

Regarding visitation, mother's attendance was "semi-consistent" and "appropriate for the most part." In February 2019, the eldest sibling decided she did not want to be around her mother anymore and stopped attending the visits. While the visits were generally going well, mother would sometimes get into arguments with the maternal grandmother in front of the children. These arguments culminated in visitation being moved to a supervised visitation center.

Mother's living conditions were unstable during the first reunification period. She bounced around between friends' houses and motels. The children continued to do well in the maternal grandmother's care. The older sibling reported that she wanted to live with her maternal grandparents permanently. The middle sibling, though she felt comfortable with the maternal grandparents, "really misse[d] her mom." The maternal grandmother stated she was not willing to provide permanency for two-year old R.W., however, because of her advanced age and him being very active.

Toward the end of this reunification period, mother was arrested for possession of methamphetamine.

Notwithstanding mother's minimal progress by the end of the first reunification period, SSA recommended a second period of reunification services.[4] The court adopted SSA's proposed findings and recommendations.

---

[4] It appears from the record that SSA was not aware of mother's recent arrest when it recommended continuing reunification services.

8

*Second Reunification Period: July 2019 — January 2020*

Toward the beginning of the second reunification period, R.W. was removed from the maternal grandmother's care at her request and placed with a foster family.

Mother attended counseling during the second reunification period, but her counselor reported she "does not have much insight" into her role in losing custody of her children. Another therapist reported that mother's "mannerisms to me seem like she's under the influence." Through her counseling, she only drug tested twice, one of which, toward the end of the reunification period, was positive for methamphetamine.

Mother did not participate in any parenting classes.

Other than obtaining a prescription for depression, Mother made no progress on obtaining psychiatric care.

Regarding random drug testing, mother missed 26 out of 31 tests. Toward the end of the reunification period she tested positive for methamphetamine on two occasions. Midway through the reunification period she requested a drug patch, but then she made no effort to have it applied once it was approved. Although she claimed to be attending 12-step meetings, she had no proof of attendance. She claimed to have a sponsor, but the alleged sponsor could not even tell the social worker what step mother was on. She attended outpatient drug counseling for a couple of months but did not do any drug tests.

Mother's visitations were once again "semi-consistent" and generally positive. The older sibling began attending visits once again. The only issue during visitation was that mother reported headaches and feeling sick a lot, requiring her to spend a lot of the time laying down.

Mother's compliance with her case plan was once again described as minimal. Consequently, SSA recommended terminating reunification services. Father, on the other hand, had made substantial progress on his case plan, and thus SSA recommended another six months of reunification services for him. The court agreed and terminated reunification services as to mother. The court extended reunification services to the father. Because reunification was still possible with the father, the court did not set a selection and implementation hearing pursuant to Welfare and Institutions Code section 366.26.

Mother appealed from the order terminating reunification services, but only as to R.W., not the two older siblings.

DISCUSSION

On appeal, mother contends the court abused its discretion in terminating her reunification services despite extending father's services. We disagree

Where a parent does not reunite with a dependent child after 12 months of reasonable services, the court may extend services to the 18 month review "only if it finds that there is a *substantial probability* that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time . . . ." (Welf. & Inst. Code, § 366.21, subd. (g)(1), italics added.)

Mother does not challenge the court's finding that there was no substantial probability of R.W.'s return to mother after another six months of services. Unquestionably, substantial evidence supported the court's ruling. The two principal factors that led to the dependency proceeding were mother's drug use and her mental health. She made no progress on the drug use. To the contrary, her drug use was arguably worse at the end of 12 months as she had almost 12 straight months of positive

10

drug tests and was still actively using methamphetamine.[5] Moreover, she made almost no progress on her mental health as she refused to acknowledge her own role in losing custody of her children and did not seriously pursue psychiatric counseling and medication.

Rather than make a substantial evidence challenge, mother contends that because father's services were continued, the court abused its discretion in declining to extend her services as well. Mother is correct that, under these circumstances, the court had discretion to extend her services. "Where, as here, the court continues one parent's services and does not set a section 366.26 hearing, it retains discretion to terminate the other (nonreunifying) parent's services. [Citations.] The parent seeking additional services has the burden of showing such an order would serve the child's best interests." (*In re Katelynn Y.* (2012) 209 Cal.App.4th at p. 881.) However, "[i]n exercising that discretion, the court [has] the ability to evaluate whether the parent will utilize additional services and whether those services would ultimately inure to the benefit of the minor." (*In re Jesse W.* (2007) 157 Cal.App.4th at p. 66.) Moreover, "In deciding whether to extend or terminate reunification services, the court does not consider the parents as one unit, but instead treats each of them on his or her own merits." (*In re Katelynn Y.*, at p. 877.) "Indeed, at each review hearing, the court must evaluate the efforts or progress toward reunification made by each parent individually by considering 'the extent to which *he or she* availed *himself or herself* to services provided.'" (*In re Jesse W.*, at p. 60.)

Mother has not pointed to any facts here that suggest an abuse of discretion. The court had no reason to believe that mother would utilize most of the services offered to her, nor any reason to believe she would even approach a point of reunification.

___

[5] "[A] missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.)

Mother had already been given *12 months* of services, which she essentially spurned, making only token efforts. She missed the vast majority of her drug tests, and made no serious attempt to address her mental health issues, both of which were instrumental in creating the need for R.W.'s dependency. She was plainly still abusing methamphetamine at the end of 12 months and was showing no signs of stopping. There was nothing to be gained for R.W. by offering mother services she had no real interest in. And the court was by no means required to give mother, whose compliance with her case plan was minimal, the same opportunities afforded father, whose compliance was substantial. There was no abuse of discretion.

DISPOSITION

The postjudgment order is affirmed.

IKOLA, ACTING P. J.

WE CONCUR:

THOMPSON, J.

GOETHALS, J.

12