Filed 1/27/21  In re I.K. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re I.K., a Person Coming Under the Juvenile Court Law. | B305495 (Los Angeles County Super. Ct. No. 18CCJP05754) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>E.M.,<br><br>　　　Defendant and Appellant. | |

APPEAL from the jurisdictional order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother, E.M., appeals from the juvenile court's jurisdictional order taking jurisdiction over mother's infant daughter I.K.  I.K.'s two older sisters have been dependents of the juvenile court since before turning one year old.  Mother argues that the juvenile court erred in taking jurisdiction over I.K. because no substantial evidence showed that mother posed a current risk to I.K.  We reject mother's argument for two reasons.  First, because dependency jurisdiction is over the child, we must affirm the jurisdictional order based on the uncontested allegations sustained against father.  Second, substantial evidence here did support the juvenile court's jurisdictional order insofar as it sustained allegations against mother.  There was evidence, despite mother's arguments to the contrary, that at the time of the jurisdictional hearing, mother continued to suffer from the same substance abuse that caused her to lose custody of I.K.'s two older siblings and that mother's substance abuse posed a risk to I.K.  We thus affirm the juvenile court's jurisdictional order.

## BACKGROUND

### 1. *Mother Lived in Foster Care Until She Absconded With Her Eldest Child, A Dependent of the Juvenile Court*

Mother was born in 1999, and entered foster care at the age of 12.  Mother's mother (maternal grandmother) used crystal

methamphetamine and mother witnessed domestic violence in her family. Mother reported that her uncle touched her and that maternal grandmother beat her. Mother started smoking marijuana when she was 12 years old. Mother explained that she used marijuana to treat her anxiety and panic attacks.

Mother's eldest child, C.K., was born in November 2015. The juvenile court took jurisdiction over C.K. because mother's marijuana abuse rendered mother unable to care for C.K. Although the exact date is unclear, it is undisputed that mother "abduct[ed]" C.K. The juvenile court had issued a warrant to arrest mother, apparently for absconding with C.K. "Mother reported that she spent time in jail until she returned [C.K.] to DCFS['s] care."[1]

Eventually, the juvenile court terminated mother's reunification services with C.K. Mother reported that C.K. was placed with her aunt, and mother was pleased with the placement. Mother "didn't want to take the chance of not meeting her [C.K.'s] needs."

The social worker responsible for C.K.'s dependency reported that mother was "constant[ly] AWOLing." The social worker reported "mother's history of being incapable of maintaining stable housing and not being able to care for herself demonstrates that she is not ready to care for a child."

2. *Mother's Child, L.K., Dies*

Mother's second child, L.K. died in utero. Two days before his death, mother tested positive for marijuana. Maternal

---

[1] In the context of C.K.'s dependency case, a supplemental petition alleging domestic violence between mother and father was dismissed in the interest of justice.

3

grandmother reported that "mother and father were involved in a physical altercation . . . which caused mother to miscarry."

### 3. *Mother's Child, P.K., Is a Dependent of the Juvenile Court*

P.K. was born in 2018. The juvenile court assumed jurisdiction over P.K. because of mother's substance abuse. The juvenile court sustained an allegation of general neglect after mother smoked marijuana while holding P.K. When investigating P.K.'s case, social workers observed that mother's home was "unkempt, filthy, messy, and unsuitable . . . for an infant."

At the time the current dependency proceedings commenced, mother had monitored visits with P.K. Both C.K. and P.K. were dependents of the juvenile court since they were four or five months old.

### 4. *DCFS Files a Petition Naming I.K.*

On August 29, 2019, DCFS filed a Welfare and Institutions Code section 300 petition concerning then two-month old I.K.[2] The petition alleged that father failed to protect P.K. from mother's substance abuse. The petition further alleged that father failed to protect P.K. when he should have known mother had absconded with C.K. and should have known mother's whereabouts. The petition alleged that father failed to participate in juvenile court ordered services.

The petition further alleged that mother "secreted" C.K. from DCFS and the juvenile court and that C.K. is a dependent

---

[2] Undesignated statutory citations are to the Welfare and Institutions Code.

4

receiving permanent placement services due to mother and father's conduct. The petition further alleged that mother has a history of substance abuse, including marijuana, which renders mother incapable of providing regular care and supervision for I.K. In addition, mother failed "regularly [to] submit to Juvenile Court ordered random drug testing." Finally, the petition alleged that I.K.'s sibling was a dependent of the juvenile court based on mother's substance abuse.

### 5.    *DCFS's Detention and Jurisdiction Reports*

Prior to detention, I.K. resided with mother. Father did not live in the same home as mother. The juvenile court ordered I.K. detained from father only. The court permitted father monitored visitation three times a week. The juvenile court ordered that DCFS approve the monitor and that the visits occur in a DCFS approved setting. The court ordered I.K. "released to the home of mother."

DCFS reported that mother regularly missed court ordered testing for controlled substances. Mother missed three random tests in July 2019, three tests in August 2019, two tests in September 2019, and one test in October 2019. In six tests between August 6, 2019 and October 2, 2019, however, she tested negative.

During an interview with a social worker, mother reported that she had stopped using marijuana in April 2019 (two months before I.K.'s birth). Mother, however, admitted using marijuana during the early stages of her pregnancy with I.K. Mother denied smoking marijuana in the presence of her children. Mother stated that she was diagnosed with depression and prescribed medication, but took the prescribed medication only once or twice because she did not like its side effects. Mother represented she

participated in parenting classes. Mother reported the juvenile court had previously ordered her to complete random drug testing, individual counseling, and parenting classes.

A facilitator from wraparound services[3] reported that mother was diagnosed with major depressive disorder and generalized anxiety. The facilitator stated mother had regularly attended parenting classes and her parenting skills had improved. Mother's therapist reported that although mother had enrolled in therapy, the therapist had "not 'seen mother in a while.'" The therapist also reported that mother had made progress in therapy but the therapist was unwilling to share mother's therapeutic goals. The therapist believed mother could care for I.K.

A social worker concluded: "Even though, mother is enrolled in parenting, individual counseling and random drug and alcohol testing, there are concerns regarding mother's extensive substance abuse history, in utero drug exposure to child, mother's failure to submit to random drug testing on a regular consistent basis, and inconsistent participation with individual counselling sessions and parenting. Given that mother is breastfeeding [I.K.], it is imperative that mother submits to random drug and alcohol test[ing] on a constant basis to ensure that mother is maintaining her sobriety." Social workers further expressed concern that "[m]other seems unable to recognize problems and threats that place the child's safety at

---

[3] "'Wraparound services' means community-based intervention services that emphasize the strengths of the child and family and includes the delivery of coordinated, highly individualized unconditional services to address needs and achieve positive outcomes in their lives." (§ 18251, subd. (d).)

6

risk, despite participation in services in the past and present (i.e. Parenting Education program). Apparently, mother did not truly benefit and/or internalize the knowledge obtained in the parenting class given that mother was unable to recognize that her in utero drug exposure could have detrimental effects on her child's physical and emotional health."

## 6. *First Amended Petition*

On November 1, 2019, DCFS filed a first amended petition. In addition to the allegations in the original petition, DCFS alleged that mother has mental and emotional problems, including depression and anxiety, that render her unable to care regularly for I.K. The petition further alleged that mother uses marijuana to self-medicate.

## 7. *Second Amended Petition*

In a second amended petition, DCFS added allegations that I.K.'s home "was found to be in a filthy, unsanitary, unsafe and hazardous condition. Such condition included presence of rodents, trash, garbage, filthy clothes, and bottles of urine." The second amended petition averred mother and father have a history of engaging in violent altercations that jeopardize I.K.'s safety. According to the second amended petition, father has a history of substance abuse, including marijuana, rendering him incapable of caring for I.K.

## 8. *Additional DCFS Reports Following the Amended Petitions*

An unidentified reporting party indicated that mother and father were living together in a rented room. I.K. was still living

7

with mother at that time.[4]  Social workers were concerned because father was supposed to have only monitored visits with I.K.  The unidentified caller reported that mother and father exposed I.K. to marijuana smoke in the rented room.  The caller stated mother and father "trashed" the room they were renting, and there was trash and blunt wraps (papers to roll marijuana) on the floor.  The caller also reported "father urinates in a bottle and leaves the bottle in the room."  The caller stated there were mice and dirty diapers in the room.  The caller believed that father left a dead mouse in his living room.  The reporting party was concerned that father left the heater on and that the trash in the room might catch on fire.

When a social worker visited father's home unannounced at 8 a.m., mother answered the door in her pajamas and "was rubbing her eyes as if she just woke up."  Mother denied living there.  The social worker observed the home to be "disorganized, dirty, messy" and containing I.K.'s clothing.  Based on her observations, the social worker concluded that mother was living with father.

In January 2020, mother's therapist reported that mother regularly attended therapy and learned mindfulness exercises.  Mother was working on improving her stability and planned to move into a shelter at an unspecified date.  I.K. often attended the therapy sessions with mother and appeared happy.

I.K.'s paternal great grandmother reported that mother lived with her but did not always stay at paternal great

---

[4]  The juvenile court denied DCFS's request to detain I.K. from mother.

grandmother's home.  At night, mother sometimes stayed with father.

Mother reported that she attended therapy but was not attending her random drug tests.  Mother explained that she did not attend the drug tests because she had lost her identification card.

Mother did not appear for her scheduled drug tests on January 3, January 8, January 16, January 17, January 18, or January 22, 2020.  Mother did not appear for drug tests scheduled on March 6, March 10, or March 12, 2020 either.

### 9.  *Hearing on Jurisdiction*

At the jurisdictional hearing regarding I.K., a social worker testified that mother took parenting classes and participated in individual therapy.  I.K. appeared healthy when the social worker observed her with mother.

The social worker testified that when she visited father's home, mother exited in pajama pants and the social worker learned that mother had arrived at 1:00 a.m. and was still present at approximately 8:15 a.m.  The social worker also testified that she learned mother and father had been residing in father's home since July 2019.  On one visit, the social worker was able to look inside the home and saw children's toys and clothing.  She observed a bouncy chair and a bottle warmer.  The social worker testified that the home was unsanitary.  There were bags of clothing and trash on the floor and a heater on the ground.  The social worker described the home as cluttered, making it difficult to walk around.  The social worker observed that mother's and father's names were listed on an eviction notice.

Mother denied living with father. Mother testified that her name may have been on the eviction notice because maternal grandmother was a friend of father's landlord. Mother testified that social workers did not tell her she could not be at father's home until after the social worker saw her in father's home.

Mother further testified that she had attended therapy consistently since April 2019 except for a period when she was changing therapists. Through dependency court services, mother also received weekly assistance with her school work and parenting issues.

Mother denied any domestic violence between her and father. Mother testified she had not smoked marijuana since April 2019. She admitted she did not always participate in her court ordered random drug tests. According to mother, she did not always have the required identification or paperwork. Mother missed one test because she was in court. Mother acknowledged that there were other missed tests and she did not remember why she missed them. In response to questioning from the court, mother testified she had two identifications but had lost both of them.

Mother's counsel requested that the juvenile court dismiss the petition. Counsel argued that there was no current risk to I.K. Mother's counsel further argued that mother did not live in father's home. I.K.'s counsel similarly argued that mother posed no current risk to I.K. I.K.'s counsel recognized that mother "was at" father's home and that the condition of the home was unsafe for I.K., but argued that the unsafe condition did not pose a risk to I.K. at the time of the jurisdictional hearing because father was no longer living there. I.K.'s counsel acknowledged there was evidence to sustain the allegations that father had a history

of substance abuse rendering him unable to provide regular care for I.K.

**10.** *The Juvenile Court Assumed Jurisdiction Over I.K.*

The juvenile court sustained the following allegations: Father failed to protect P.K. from mother's substance abuse. Father failed to participate in court ordered services. I.K.'s sibling is a current dependent of the juvenile court due to mother's substance abuse and father's failure to protect the child. Father has a history of substance abuse, including marijuana, that renders him incapable of providing I.K. with regular care and supervision.[5] Mother has a history of mental and emotional

---

[5] The court sustained many of the same or similar allegations under section 300, subdivisions (b) and (j). Section 300, subdivision (b)(1), provides in pertinent part: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Section 300, subdivision (j) provides: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers

problems including depression and anxiety that interferes with the mother's ability to provide regular care for I.K. Mother has failed to consistently participate in mental health services and used marijuana to self-medicate in the past. I.K.'s home was found to be in a filthy and hazardous condition. "Such a filthy and unsanitary home environment established for the child by the father, . . . and mother . . . endangers the child's physical and emotional health and safety . . . and places the child at risk of physical and emotional harm . . . ."

The juvenile court explained that "the court's concern is . . . that this is a young mother, and she was in our system as a child herself. She had a lot of difficulties. Her mother was abusive. She [maternal grandmother] beat her [mother]. She [maternal grandmother] used meth[amphetamine]. She [maternal grandmother] abandoned her. So she [mother] didn't have a good role model for being a mother. So my heart goes out to her for that. And she's had some difficulties with her other kids, and she is coming along. So I don't want to defeat her. But on the other hand, I want mother to understand, when we talk about what to do in the future, . . . it's not her [decision] to determine whether she goes to testing or not. It's not [for] her . . . to decide whether she spends the night with somebody else. But she has to make the choice that the priority is her child . . . ."

## 11.  *Disposition*

The juvenile court found that there were reasonable measures that could prevent removal of I.K. from mother's

---

probative in determining whether there is a substantial risk to the child."

custody.  The court permitted mother to retain custody of I.K.
The juvenile court ordered mother to take 10 random drug tests,
participate in individual counseling, and take additional
parenting classes.

The court removed I.K. from father "based on clear and
convincing evidence that father has not made any efforts to
engage in any services with his other two children, and he
has not engaged and not kept in touch with the social worker in
this case . . . ."  Father did not appeal.  Mother filed a timely
appeal.

## DISCUSSION

Mother demonstrates no error in the juvenile court's order
assuming jurisdiction over I.K.  First, it is uncontested that the
juvenile court properly assumed jurisdiction over I.K. based on
the allegations against father.  Second, mother's challenge to the
sufficiency of the evidence lacks merit.

## A.     The Juvenile Court Did Not Err Because Jurisdiction Over I.K. Based on Father's Conduct is Unchallenged

No one has challenged on appeal the juvenile court's
taking jurisdiction over I.K. based on father's conduct.  We may
affirm the jurisdictional order if any ground for jurisdiction
supports the court's jurisdictional order because juvenile court
jurisdiction is over the child and not the parents.  (*In re I.J.*
(2013) 56 Cal.4th 766, 773.)  Thus, even were we arguendo to
accept mother's challenge to some of the grounds for jurisdiction,
we would affirm the juvenile court's jurisdictional order.

In her reply brief, mother argues "[i]f the evidence did not
support the allegations against Mother, it did not support her

case plan." That is a non sequitur. The juvenile court may order mother to participate in services regardless of whether the sustained allegations concerned her or father. (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.) The juvenile court "had the authority to order a nonoffending parent to participate in services. Section 362, subdivision (a) gives the court the authority, once a child is declared a dependent, to 'make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child.' " (*D.L.*, *supra*, at p. 1148.)

No reasonable argument can be made that mother's case plan was unrelated to the uncontested reasons the juvenile court took jurisdiction over I.K. Mother's substance abuse is intertwined with the uncontested allegations against father and justifies the court's order of 10 random tests for controlled substances. It is undisputed that father did not protect P.K. from mother's substance abuse and that father's failure to protect P.K. placed I.K. at risk of serious harm. It is also undisputed that mother's marijuana abuse caused her to lose custody of I.K.'s two sisters. Further, given that mother has lost custody of I.K.'s sisters, I.K. would benefit from mother's participation in parenting classes and individual counseling, especially in light of social worker reports that mother "did not truly benefit and/or internalize the knowledge obtained in the parenting class" she previously took. In short, the case plan is appropriate regardless of whether mother is successful in contesting the allegations against her. .

**B.    Substantial Evidence Supported the Jurisdictional Allegations Against Mother**

We affirm the jurisdictional order for the independent reason that substantial evidence supported the jurisdictional allegations against mother.  On appeal, mother argues that, at the time of the jurisdictional hearing, there was no current risk of harm to I.K.  More specifically, she contends there was no evidence of recent marijuana use and therefore no current substantial risk of serious physical harm to I.K.  According to mother, "this Court must consider not Mother's past marijuana use or emotional health but the threshold question of whether she has failed to supervise, protect, or provide regular care to I.K."

Under section 300, subdivision (b) and section 300, subdivision (j) there must be current risk to the child to support dependency jurisdiction.  (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803; see *ibid.* ["[W]e must conclude that a finding of current risk is required for jurisdiction under subdivisions (b) and (j) . . . ."].)  That does not mean that evidence of past abuse is irrelevant.  "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation].  The court may consider past events in deciding whether a child presently needs the court's protection.  [Citation.]  A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216; *In re Kadence P.* (2015)

15

241 Cal.App.4th 1376, 1383–1384 [past events are relevant when assessing jurisdiction].)

Our standard of review is familiar. " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citation.]" [Citation.]' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

The premise of mother's argument—that there was no evidence of recent marijuana use—is inconsistent with the record, which demonstrates at the time of the jurisdictional hearing that mother had recently used marijuana. Mother admitted to using marijuana when she was pregnant with I.K. Shortly before the jurisdictional hearing, mother missed her tests for controlled substances on January 3, January 8, January 16, January 17, January 18, and January 22, 2020. Mother also did not appear for any of her scheduled drug tests in March 2020, including those days just before the trial court issued its

16

jurisdictional order.  Although mother missed one test because she was in court, she provided an inadequate excuse of losing her identification for missing several other tests and no excuse for missing the remainder.  Missed tests without adequate justification, as is the case here, allow us to presume that those missed tests would have been positive.  (*In re Kadence P.*, *supra*, 241 Cal.App.4th at p. 1384; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.)

Although marijuana use does not automatically support jurisdiction (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1050), in this case, mother's marijuana use rose to the level of abuse when it caused her to lose custody of two children.  (See *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1218 [failure to fulfill major role obligations in the home is one of several definitions of substance abuse].)

Additionally, despite court-ordered random drug testing in connection with P.K.'s case, mother continued to use marijuana and regularly failed to show up for her drug tests.  (See *In re Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1218–1219.) Mother exposed I.K. to marijuana in utero and to marijuana smoke in father's home.  Finally, although mother attended therapy, there was no evidence that she addressed her depression and anxiety, which the juvenile court found caused her to "self medicate" with marijuana.  Thus, the juvenile court could infer that mother's marijuana abuse was likely to continue absent juvenile court intervention.  Mother's argument that at the time of the jurisdictional hearing, there was no substantial risk to I.K. fails to acknowledge the full record and is thus unpersuasive. (See *In re Kadence P.*, *supra*, 241 Cal.App.4th 1376, 1385–1386.)

Mother argues that the record here "resembles" *In re David M.* (2005) 134 Cal.App.4th 822, 829,[6] in which the appellate court reversed a jurisdictional order. We disagree. In *David M.,* the court concluded that evidence of the mother's mental and substance abuse problems and the father's mental problems, was never tied to any actual harm to the minor. (*Ibid.*) In that case, however, there was uncontradicted evidence the child was "healthy, well cared for, and loved" while living in a "clean, tidy home." (*Id.* at p. 830.) Mother had testified negative for drugs approximately 18 times and had apparently valid excuses for her missed tests. (*Ibid.*)

That is not the case here. Father's home was cluttered with trash, rodents, and dirty diapers. Although the record shows that father was evicted from his home removing any risk to I.K. based on the unsanitary condition of that specific home, there was no evidence that either mother or father understood the need to provide a safe home for I.K., including one free "from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) Whether or not mother lived with father, she visited father's home with I.K. regularly, a home that mother does not contest was "unsafe," "unsanitary," and "hazardous." A social worker observed I.K.'s toys and clothing in a home that posed great risk to an infant unable to avoid the clutter, trash, and dead rodent in the living space. These unhealthy conditions also fit a pattern; mother's home with P.K. was also "unkempt, filthy, messy, and unsuitable . . . for an infant." Mother,

---

[6] Abrogated on a different ground in *In re R.T.* (2017) 3 Cal.5th 622, 628.

18

moreover, missed several drug tests with no excuse.  This case thus hardly "resembles" *In re David M.*

## DISPOSITION

The juvenile court's jurisdictional order is affirmed. NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19