Filed 9/22/21  In re A.R. CA4/2
Reposted with corrected file date

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.P., Defendant and Appellant. | E076353 E076815 (Super.Ct.Nos. J275382, J275383 & J281025) OPINION |
| In re I.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.P., Defendant and Appellant. | |

1

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

Mother has had open juvenile dependency cases involving her children since shortly after her second child tested positive for amphetamines at birth.

Mother has struggled to maintain sobriety since then, despite attending a residential inpatient substance abuse program and several outpatient substance abuse programs. Among other things, she admitted to using methamphetamines during her pregnancy with her youngest child, who was born after dependency proceedings started for his siblings. Though she says her last relapse was in February 2020, she's failed to take required drug tests on several occasions since then.

Mother filed two change-in-circumstance petitions in 2020—one in July and another in November—and the juvenile court judge denied both petitions. In the first petition she asked the judge to order a bonding study, but she didn't renew that request in the second petition. The judge ordered a permanent plan of concurrent placement for the older two children, who were not deemed adoptable, and the department placed them in a concurrent home in September 2020. In February 2021, the judge terminated mother's parental rights over the youngest child and ordered adoption as his permanent plan.

2

Mother argues the judge erred by denying her request for a bonding study, denying her section 388 petitions, and failing to apply the beneficial parental relationship exception rather than terminate her parental rights over her youngest child. We conclude the judge didn't abuse his discretion and therefore affirm.

**I**

**FACTS**

A. *Dependencies of the Two Older Siblings*

In November 2017, mother gave birth to her second child, and both mother and daughter tested positive for amphetamine. Mother told the social worker she had started using methamphetamine in May 2015 and admitted she had smoked methamphetamine two days before giving birth. She told the social worker she had an autistic seven-year-old child living with her as well.

The maternal grandmother told the social worker mother had recently moved into her home. She said she was aware of mother's past drug use but believed she had stopped using drugs. She said the older sibling wasn't in school because he was being transferred to a school closer to home. After a meeting involving San Bernardino Child and Family Services (department) social workers, mother, the younger child's father,[1] and the maternal grandparents, the department placed the family under a voluntary family maintenance plan, which included an agreement that mother would submit to random drug testing and enroll in a perinatal program. However, mother then forged a document

_____

[1] Father is not a party to this appeal, so we have left out facts related to his parental rights.

3

claiming she completed a substance abuse treatment program and continued to use methamphetamine, so the department removed the two children from mother's care.

On March 26, 2018, the department filed section 300 petitions on behalf of both children based on mother's drug use. The juvenile court judge, San Bernardino County Superior Court Judge Steven Mapes, ordered the children detained on March 27, 2018.

In their jurisdiction/disposition report, the department recommended sustaining the petitions and ordering family reunification services for mother. The department reported mother had admitted to using methamphetamine from November 2017 through February 2018, during her pregnancy with the younger child. She said she had started using methamphetamine about once a week and eventually increased to using daily. Mother had been dropped from an outpatient substance abuse program, and she was trying to enroll in another one. The social worker attempted to speak with the older child, but he struggled to answer even simple questions.

The children were placed together in foster care. They were adjusting well in their placement and responded positively to their foster caregiver. During a supervised visit, the older child appeared happy to see mother. She tried to engage him in conversation and play, but he spent most of his time playing alone. The social worker described mother as attentive and said she had good interactions with the children.

At a jurisdiction/disposition hearing, the juvenile court sustained the section 300 petitions and ordered reunification services for mother. But in their six-month status review report, the department recommended terminating reunification services and

4

setting a section 366.26 hearing to establish a plan of adoption. Mother had been referred to drug treatment programs four times and had been unsuccessful in completing any of them. She was terminated from two outpatient programs for continuing to test positive for substances and for nonattendance. She also left an inpatient drug treatment program after three days. She had recently started another outpatient drug treatment program and had completed several sessions of individual counseling and parenting education classes. She was also pregnant and due to give birth to a third child in April 2019.

Mother did regularly attend visits with the children, which were supervised by the caregiver. The caregiver reported mother was engaging and appropriate with the younger child. However, she would give the older autistic child her cell phone at the beginning of visits, and he would spend most of the time on the device. Mother also brought other family members, usually around the older child's age, and they would engage with the older child while she was engaged with the younger child.

The department later updated their report to inform the court mother was at risk of being terminated from her substance abuse treatment program for failing to attend. She had missed eight sessions in three months and was put on a behavioral contract for sporadic attendance and testing positive for methamphetamine. She tested negative for drugs in September and October 2018, but then tested positive on November 15, missed an appointment, and tested positive again on November 28. She then missed three later appointments. Mother's therapist also reported her attendance had been sporadic. She did, however, continue to regularly attend all of her visits with the children.

At the contested six-month review hearing, the judge found mother had failed to participate regularly or make substantive progress in her reunification plan. He then terminated reunification services and set the section 366.26 hearing for both children.

In their section 366.26 report, the department recommended the children receive services under a plan of permanency planning living arrangement with a goal of adoption. The children's caregivers weren't interested in adopting them but were willing to continue to provide care until a concurrent planning home could be located. The caregivers reported the older child's behavioral issues and communication had improved but that he would likely require ongoing services based on concerns about autism. Mother continued to visit the children, but the visits occurred at her inpatient drug treatment program. The caregiver reported mother engaged very little with the older child, who would watch television by himself. Mother did engage with the younger child and would walk around the room with her and play games with her.

On April 4, 2019, mother filed a section 388 petition requesting the children be returned to her care and her parental rights not be terminated. She said she had completed an inpatient substance abuse program, was living in transitional housing, and had enrolled in an outpatient substance abuse program. The court ordered an evidentiary hearing on the section 388 petition. The department recommended the juvenile court judge grant her petition and offer her reunification services. The social worker reported mother took responsibility for the children being removed from her care. She said she had used methamphetamine with father and said he triggered the relapse by cheating on her. She

recognized she was codependent and knew she had to keep her distance from him.

On April 11, 2019, the judge granted mother's section 388 petition and gave her additional reunification services.

B. *The Dependency of the Youngest Child*

The next month, in May 2019, mother gave birth to her third child. She admitted she had used methamphetamine from November 2018 to January 2019 while she was pregnant.

A few days later, the social worker and a drug and alcohol counselor interviewed her at her transitional home. She showed no visible signs of recent drug use. She said after testing positive and noticing she was going down a bad path, she checked herself into an inpatient substance abuse program and received services. She said she was no longer in a relationship with the father. The social worker assigned to the older children said mother had been progressing well in her case plan since January 2019.

Ten days later, the department filed a petition on the new child's behalf under section 300, subdivisions (b) and (j), alleging appellant had a substance abuse and general neglect history based on what happened in her other children's dependency cases. At the detention hearing, the juvenile court judge found a prima facie case and ordered the child detained in mother's care.

On June 7, 2019, mother advised the social worker she had been discharged from her transitional housing for not signing out, missing a house meeting, and coming home late. She and the infant had moved in with the maternal grandmother. She said she had

been clean for approximately five months and was adamant about maintaining her sobriety. She also continued to visit the older children, and there were no reported problems at these visits.

On August 2, 2019, the department removed the child from mother's care after she tested positive twice for methamphetamine and missed other random drug test appointments. Mother admitted she had relapsed and expressed her remorse. The foster parents for the older children declined to have the new child placed with them, and he was placed in a separate foster care home.

On August 6, 2019, the department filed an amended section 300 petition on behalf of the new child under subdivisions (b), (g) and (j), based on mother's drug use, open dependency cases involving his siblings, and the fact that father's whereabouts were unknown. At the detention hearing, the judge found a prima facie case and ordered the child removed from mother's care. At the jurisdiction/disposition hearing, the court amended and sustained the allegations in the section 300 petition and granted services to mother.

C. *Setting of the Section 366.26 Hearings*

In their report submitted before the 18-month review hearing for the older siblings, the department recommended the judge terminate reunification services and set a section 366.26 hearing to establish a permanent plan of legal guardianship for the children. They reported mother was enrolled in an outpatient substance abuse program, had tested positive for amphetamine on July 11 and July 25, 2019, and failed to test on four other

8

occasions.

The children were adjusting well in their foster care home and were bonded to the foster parents. However, the foster parents were not interested in providing long term care for the children through legal guardianship. The older child was found not to be on the autism spectrum, but he was severely delayed. The foster mother reported he had made good progress and was verbal and helpful around the house. The younger child had no developmental concerns.

The foster mother reported mother arrived late for visits and at times was attentive only to the younger child. At one visit, mother invited other children to a theme park with them and left the children unattended, leaving the foster mother to watch all of the children. She also brought other relatives to visits without telling the foster mother beforehand. When the social worker asked the older child whether he would like to reunify with mother, he said he liked his foster parents and wanted to stay with them.

Mother continued to struggle in her recovery. On October 30, 2019, the department reported mother was still in the outpatient program where she had been enrolled since June 19, 2019. She had tested negative for drugs twice in September, but the most recent test was faint and questionable. She failed to test twice in September 2019, and she missed several group sessions as well. She had been expected to complete the program in October but was delayed due to her numerous absences and continued drug use. She tested positive for methamphetamine on October 22, 2019 and on November 4, 2019. She admitted to the social worker that she had relapsed on November

9

2 and again on November 16. She said she felt stressed about the children's dependency cases. She did test negative on November 6 and 26 and December 6, 2019. However, on December 20, 2019, she was terminated from the outpatient program for absences and was waiting to be reassessed for a residential program.

On January 22, 2020, the juvenile court judge terminated mother's reunification services for the two older children and set a section 366.26 hearing. The court reduced visitation to once a month for two hours.

In March 2020, the department recommended the judge terminate mother's reunification services for the youngest child and set a section 366.26 hearing to establish a plan of guardianship or adoption for him. They reported mother had been referred to another substance abuse treatment program, and the program intake coordinator advised the social worker on February 5, 2020, that mother had tested positive for amphetamine. When asked about the relapse, mother initially denied using any form of drugs and later said "she slept with someone, and that the methamphetamines was on the genitals and that is how it got in her system."

The department reported mother was on time to visits with the youngest child, and she engaged with him, fed him, and changed his diapers. The department reported the child was thriving and developing a strong and healthy bond with his caregiver, who was committed to providing a stable home and a nurturing environment for him, as well as to adopt the child or become his legal guardian. On June 12, 2020, the social worker met with mother, who admitted her last relapse was in February 2020, which she blamed on a

death in the family.

On July 13, 2020, mother filed a section 388 petition to change the order related to all three children by reinstating her reunification services and increasing the frequency of visits. She also asked for a bonding study. She said she had completed two of three services, recognized her mistakes and was trying to be independent for herself and the children. The judge denied the petition without a hearing, finding the request did not state new evidence or a change in circumstances.

A short time later the juvenile court judge delayed the section 366.26 hearing for the two older siblings because they were not a proper subject for adoption at the time and a potential legal guardian had not been identified. He ordered a permanent plan of placement in foster care with a continuing search for adoption. The judge ordered supervised visitation one time a month for two hours. On September 2, 2020, the department placed the older siblings in a concurrent home, and the children responded extremely well to the family.

On August 20, 2020, mother told the social worker she was living with the maternal grandfather and continued to attend her outpatient substance abuse program. She had begun the program on June 4 and participated once a week through an online video connection. She said she didn't test through the program but through the department. The social worker noted mother had missed several testing appointments between February and August.

On August 26, 2020, at the six-month review hearing for the youngest child, the

court terminated mother's reunification services and set a section 366.26 hearing. In a section 366.26 report, the department recommended terminating mother's parental rights over the child and implementing a plan of adoption. They reported the child had been with the same caregiver since October 2019 and the child and caregiver had bonded. The caregiver said she wanted to adopt the child and would allow mother and child to visit even after adoption because she believed it was important for the child to maintain a connection to the biological mother.

D. *Mother's Final Section 388 Petitions*

On November 23, 2020, mother filed separate section 388 petitions for each of the children asking the court to return them to her care, reinstate reunification services, or at least increase the frequency and duration of her visits.

In support of her petitions, she noted she completed an outpatient drug treatment program on October 7, 2020, and she also referred to her completion of other programs in March 2019. She said the proposed change was in the children's best interests because they were bonded to her and would benefit emotionally from increased time in her care, either as their primary caregiver or at longer, more frequent visits. She said the children enjoyed her visits with them, and it was in their best interest to prevent further delay in proceeding to the next step in the reunification process and returning them to her care and custody.

On November 24, 2020, the court denied mother's section 388 petitions, finding mother hadn't provided new evidence or established there had been a change of

12

circumstances. The court noted her assertions were conclusory and he hadn't established a prima facie case of changed circumstances.

Mother filed notices of appeal on December 29, 2020, on behalf of the older children, appealing "[a]ll findings and orders made by the court regarding Termination of Parental Rights and denial of Mother's 388 Petition including but not limited to 12/08/2020."

E. *Section 366.26 Hearing for the Youngest Child*

On February 3, 2021, the social worker reported she had observed a visit between mother and the children. She reported the youngest child would not let go of his current caregiver and began to cry when mother reached out for him. The caregiver had to put the child down and let mother take him crying. He eventually stopped crying and warmed up to mother. In a later visit, the child had an easier transition from the caregiver to mother because the caregiver left after handing him to appellant.

The judge held a 366.26 hearing on February 9, 2021. He found mother had failed to meet her burden in establishing the parental benefit exception. He noted she had not occupied a parental role for the child, and while he recognized the "incidental benefits and all of that . . . and I know the mother loves the child and things like that," he concluded the benefits of adoption outweighed the benefits of maintaining the parent-child relationship. The judge found the child was adoptable, terminated the mother's parental rights and ordered adoption as the child's permanent plan.

On March 18, 2021, mother filed an amended notice of appeal on behalf of the

13

youngest child, appealing "[a]ll findings and orders made by the court regarding Termination of Parental Rights and denial of Mother's 388 petition including but not limited to 1/20/2021, 2/09/2021 and 2/12/2021."

## II

## ANALYSIS

A. *Request for a Bonding Study*

Mother argues the juvenile court judge abused his discretion by denying a bonding study, which she requested in her July 13, 2020 section 388 petition.

The department argues mother forfeited the ability to raise the bonding study issue on appeal by failing to appeal the order within 60 days of the order. (Cal. Rules of Court, rule 8.406.) They argue mother's notices of appeal were timely only as to the orders denying her later section 388 petitions, which didn't request a bonding study, and terminating her parental rights.

We agree mother forfeited the issue but emphasize she did so by failing to request a bonding study in her later petitions. The critical moment for mother was not failing to appeal from the order denying her first section 388 petition but failing to "look after [her] own legal rights by asking the juvenile court to exercise its discretion in favor of ordering a bonding study" when she filed her later motions. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341 (*Lorenzo C.*).) A juvenile court judge is not required by statute or case law to order a bonding study; it is incumbent on the parent to make a timely request for such a study and to demonstrate the need for it. Mother did not request such a

study or make a case for its need when she petitioned for a change of order as to all three children in November 2020. She has therefore forfeited her argument that the judge should have required a bonding study before terminating her parental rights. (*Ibid.*)

In any event, even assuming mother didn't forfeit the issue, there's no basis for concluding the judge erred in denying her request for a bonding study when she requested it initially. We review such decisions for abuse of discretion. (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.) "The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study"].)

In *Lorenzo C.*, the appellate court concluded the trial judge did not abuse their discretion where "the undisputed evidence was that there was some bonding between the father and Lorenzo but that the child had a stronger bond with the foster parents. . . . Also, the child was only two years old at the time of the section 366.26 hearing and had had no contact with his father during the preceding five months. Under these circumstances, it is unlikely that a bonding study would have been useful to the juvenile court. The juvenile court did not err in not ordering a bonding study." (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.)

The facts here are indistinguishable. The older children have been out of mother's care for over three years. The younger of the two was in mother's care for less than six months before she was removed. And the infant child was removed approximately three months after his birth. Though mother visited the children regularly and appeared to have

15

a good relationship with them, the visits were infrequent by January 2020, and the children had bonded with their caregivers. By the time of the 366.26 hearing, the youngest child had been in the care of someone who wanted to adopt him for over a year and had plainly bonded with her. The department reported it was difficult for the child to transition from the caregiver to mother at visits. The older two children had been placed in a concurrent home in September 2020 and were reportedly responding extremely well to the family. Mother provides no basis now for thinking a bonding study would have been useful to the trial judge in this case.

Under these circumstances, there's no basis for us to conclude the juvenile court judge acted unreasonably by refusing to order a bonding study.

B. *Section 388 Petitions*

Mother also argues the juvenile court judge erred by summarily denying both her July 2020 and November 2020 section 388 petitions. We review the judge's summary denial of a section 388 petition for abuse of discretion, asking whether the judge's decision exceeded the bounds of reason. (*In re Angel B*. (2002) 97 Cal.App.4th 454, 460.)

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*In re S.J.* (2008) 167 Cal.App.4th 953, 959 [cleaned up].)

To trigger the right to a hearing on a section 388 petition, the parent must demonstrate (1) a genuine change of circumstances or new evidence and (2) that revoking the previous order would be in the best interests of the children. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.) A petition makes a prima facie showing if the allegations, liberally construed, show both changed circumstances and that the best interests of the child may be promoted by petitioner's proposed change of order. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.) Showing circumstances are in the process of changing is insufficient. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

To support her argument for changed circumstances, mother points to the fact that she completed an outpatient substance abuse program on October 7, 2020, and a residential treatment program on March 27, 2019. The residential treatment program doesn't show her circumstances had changed since the judge terminated reunification services after she completed the program. Not only was the judge aware of the earlier program when he issued his orders, mother suffered a series of relapses throughout the later part of 2019—after she finished the program. Mother was then referred to another substance abuse treatment program, but she tested positive for amphetamine on February 5, 2020. At that point, she first denied drug use before claiming she had ingested methamphetamines accidentally during a sexual encounter.

If mother's assertion that her circumstances have changed has any basis, it lies in what happened after February 2020, which she claimed was her last relapse. And indeed, she argues that since her negative drug test on February 6, 2020, "there was no

17

indication that [she] had used substances again" and asserts she had been sober for 10 months. In June 2020, she began another outpatient treatment program, one which she attended by online video link one time a week. She said she didn't test through the program itself but through the department. However, as the social worker noted, mother missed four testing appointments during this period. Missed drug tests are presumed to be positive. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384 ["a missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result'"].) Moreover, this was a pattern with mother. She repeatedly missed drug test appointments only to admit to a relapse. It follows that the trial judge didn't err by determining mother hadn't met her burden of establishing a prima facie case of changed circumstances.

C. *Beneficial Parental Relationship Exception*

Mother argues the juvenile court judge erred in determining that section 366.26, subdivision (c)(1)(B)(i), did not apply to prevent the termination of her parental rights over her youngest child.

"'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are denied or terminated, "'the focus shifts to the needs of the child

18

for permanency and stability.'" (*Ibid*.) Adoption is preferred once reunification services have been terminated, and "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D*. (1999) 70 Cal.App.4th 38, 51.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing" evidence it is likely the child will be adopted. However, "when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception." (*In re Caden C*. (2021) 11 Cal.5th 614, 629-630 (*Caden C*.).) This exception applies when (i) the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (ii) the court finds that the parent-child relationship presents a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i).)

Recently, in *Caden C.*, our Supreme Court provided guidance for applying this exception. "The language of [the parental benefit] exception, along with its history and place in the larger dependency scheme, show that [it] applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The court indicated we should continue to be guided in our understanding of these elements by one of the

19

foundational appellate court opinions discussing the parental benefit exception, *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*), which emphasized that in "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, at p. 632.)

"'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

*Caden C.* makes clear that this is the end of the analysis. In so concluding, our Supreme Court disagreed with those appellate opinions that have required some additional compelling reason for the exception to apply. Under *Caden C.*, the only compelling reason required is that the parent-child relationship is so significant it outweighs the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 635-636.)

"What this means is that the parent asserting the parental benefit exception must

20

show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) When determining whether the exception applies, the juvenile court should consider a number of factors, including the age of the child, the amount of time they spent in the parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

We review the juvenile court judge's finding on the frequency of contact and the existence of a beneficial relationship for substantial evidence, and we apply the abuse of discretion standard to the judge's decision whether terminating parental rights would be detrimental to the child so as to outweigh the permanency benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)

Here, it is undisputed mother maintained consistent and positive contact with her youngest child. Thus, the only question we face is whether she demonstrated that she

21

shared such a substantial, positive emotional attachment with him that the harm of severing the parent-child relationship outweighed the benefit of stability in adoption.

Mother is simply not able to satisfy the second prong. The child was initially detained several days after birth, and he was placed in mother's care. However, mother was unable to maintain sobriety and the department removed the child from her care only three months later. Mother refers to her positive interactions during visits, but fails to mention the visit when the child refused to let go of his prospective adoptive mother and began to cry when mother reached out for him. In a later visit, the prospective adoptive mother made an easier transition with the child by immediately leaving after handing him to appellant. As the court noted, there were "incidental benefits and all of that" and indications that "the mother loves the children," but that's not enough to establish the child would be harmed by having the relationship with mother severed and being adopted by a caregiver who had cared for him consistently since October 2019. While visits may have been pleasant and without issues, a loving and friendly relationship is "not enough to outweigh the sense of security and belonging an adoptive home would provide." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)

In short, the child has spent almost his entire life outside mother's care, and during those extended periods he exhibited no signs the separation was causing him distress. And while he sometimes reacts positively to mother, he is plainly happy living with his prospective adoptive mother and doing well in her home. At best, the record shows the child has positive interactions with mother. Unfortunately for mother, an affectionate

22

relationship with a young child is not what the parental benefit exception was enacted to protect. We don't doubt mother loves the child, but the record contains no indication adoption will be detrimental to him. Under these circumstances, we conclude the juvenile court judge acted reasonably in determining the prospective harm in severing the parent-child relationship did not outweigh the important benefits of adoption.

## III

## DISPOSITION

We affirm the orders of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
J.

We concur:

MILLER _____
Acting P. J.

RAPHAEL _____
J.

23