Filed 1/27/23  In re S.W. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re S.W. et al., Persons Coming Under the Juvenile Court Law. | B314460 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Stephen W., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP04706A-B) |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Stephen W. (father) appeals from the juvenile court's jurisdictional findings and disposition order, declaring his two teenage children, S.W. and Noah W., dependents under Welfare and Institutions Code[1] section 300, subdivisions (a), (b), (c), and (j). Father argues the evidence was insufficient to support the jurisdictional findings that his physical abuse of Noah placed the children at risk of serious physical harm. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Dependency Referral and Petition

Father and T.P. (mother) are the parents of S.W., a daughter born in November 2004,[2] and Noah, a son born in June 2006. The family has a history with the dependency court system. In 2005, the juvenile court sustained a petition filed on behalf of S.W. based on mother's mental health issues and the parents' physical altercation in the child's presence. In 2018, the court sustained a petition filed on behalf of both children based on father's inappropriate physical discipline of Noah. The following year, the court terminated jurisdiction and granted father sole legal and physical custody of the children with

---

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2] Although S.W. recently turned 18 years old, the record on appeal does not disclose whether she remains a dependent of the juvenile court. (See § 303, subd. (a) [juvenile court "may retain jurisdiction over any person who is found to be . . . a dependent child of the juvenile court until the . . . dependent child attains 21 years of age"]; § 391 [setting forth requirements for termination of jurisdiction over nonminor dependent who has attained 18 years of age].) Thus, for purposes of this appeal, we assume that S.W. is still under the juvenile court's jurisdiction.

monitored visitation for mother. Mother also has two younger children who were dependents of the court and received permanent placement services.

The current matter came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in August 2020 based on a referral alleging physical and emotional abuse of the children by father. According to the reporting party, father repeatedly yelled at the children. At times, he could be heard yelling that he did not want them and they could leave. On August 27, 2020, the reporting party heard fighting in the home and a girl saying, " '[S]top, stop.' " Father then sent the children outside to the hallway where they could be heard crying. While the girl did not appear to have any injuries, the boy had a bruise near his right eye and a scratch on his left cheek.

The police responded to the scene and took an injury report. As described in the report, father denied hitting Noah. Father told the police that they had a verbal altercation, and that Noah acted aggressively by punching a wall and pushing a chair. Noah reported that, during the altercation, father backed him against the wall, and he responded by grabbing father's arm and swiping it away. The two then wrestled. Noah denied father hit him. S.W. told the police that she saw father and Noah wrestling, but did not know who started the fight. The police observed minor abrasions on Noah's chest, arm, and face. Based on the information provided, the police concluded the incident did not rise to the level of a crime.

After several attempts, the social worker was able to make contact with the family on September 3, 2020. In his interview with the social worker, father explained that he had sole custody

of the children and mother was entitled to visit them but did not do so. The children were currently staying with a maternal cousin, A.R. Father reported he was working on obtaining a second master's degree and becoming a licensed clinical social worker. He admitted he used marijuana daily, had struggled with alcohol in the past, and was arrested in 2019 for driving under the influence. He denied any current drug or alcohol abuse. He also admitted he had a history of domestic violence with mother and was on probation for hitting Noah in 2018.

Father expressed frustration with Noah and explained the child was becoming increasingly disrespectful by talking back to father, yelling at him, and challenging him to fight. Noah also was known to provoke others, and father repeatedly received calls from the child's school about disciplinary problems. Father described the August 27, 2020 incident as a verbal altercation that began because Noah was disrespectful to him. They screamed at one another, and Noah attempted to leave the home with father's cell phone. Father grabbed Noah and threw him on the floor to prevent him from leaving. He denied he struck Noah or knew how the child had sustained his injuries. While he acknowledged that Noah might have hurt himself during the altercation, father showed no remorse. Instead, father stated, " 'I wanted to kick him in his fucking skull but I didn't.' " Father disclosed Noah previously had been detained from him due to physical abuse, and indicated he had learned from the prior case how to control his anger. He admitted he yelled at the children when they did not listen, but denied that he was verbally abusive.

During the interview, father received a telephone call from A.R. According to father, A.R. wanted him to pick up Noah from

her home because she could not take care of the child anymore. Father told the social worker, " 'Just take him. Let the system deal with him.' " When asked if there were any other relatives who could care for Noah, Father answered, " 'No. Just take him. I don't want to deal with his shit anymore.' " Father also stated, " 'I don't care what you do with him. Just take him. I am done.' "

In her interview with the social worker, A.R. indicated that she helped father take care of the children. According to A.R., Noah recently had begun to act out in a way that was disrespectful and verbally aggressive. A.R. decided she could no longer have Noah in her home because he would not follow the rules and he pushed A.R.'s boyfriend when he was told to listen. A.R. also disclosed that Noah had stolen money from her in the past and had given her a BB gun to hold for him. A.R. had heard from the children that Noah had an altercation with father, and stated she was not surprised because Noah tended to provoke people. A.R. believed father was doing his best to raise the children, but Noah required special attention due to his behavioral issues. A.R.'s boyfriend, J.D., confirmed that he saw Noah yelling at A.R., and that he told the child to step outside to calm down. Noah responded by pushing J.D. and then taking a fighting stance. When J.D. asked Noah to stop, the child complied and stepped outside.

The social worker also met with Noah and S.W. In his interview, Noah stated that he and father had an argument over father recording him with his cell phone. Noah thought father was attempting to aggravate him so he snatched the phone from father and threw it on the floor. Father then grabbed Noah and they wrestled on the floor. Noah sustained a scratch on his left cheek and a bruise near his right eye. When asked if he was

afraid of father, Noah replied, " 'No. I am bigger than him. I was about to take off on him.' " The child added, " 'I was going to punch him but I have more respect for him.' " Noah described the altercation as an isolated incident. He acknowledged that father would yell at the children when they did not complete their chores, but denied he said that he did not want them or that they should leave. Noah also expressed that he felt like hitting father at times, especially when father taunted him. The child did not want to return to father's care. The social worker observed that Noah had a one-inch scratch on his left cheek, a small abrasion above his right eyebrow, and a dark mark on his left back.

In her interview, S.W. stated she did not see the altercation between father and Noah because she was in her bedroom. She explained she was at A.R.'s house earlier that day and did not want to leave because she was enjoying herself. When father arrived to pick up S.W., he was upset and yelled at her for not listening. Noah intervened and told father to leave S.W. alone. While in her room, S.W. heard father tell Noah to get out of the home. She then heard the sound of scuffling and yelling from father and Noah. She later saw a scratch on Noah's face. S.W. admitted father yelled at the children, but denied he told them that he did not want them or that they should leave. S.W. reported that she was not afraid of father and did not want to be removed from his care.

The social worker reviewed two cell phone videos that had been recorded by father and posted to his Facebook account. The first video dated August 27, 2020 was titled " 'Clearly I failed as a father.' " It started with Noah telling father, " 'Yeah, scar on my face. That's my face bro.' " After checking his face in the mirror, the child approached father with his fists clenched and assumed

6

a fighting stance.  Father could be heard saying, " 'Hit me if you want to.  Hit me if you want to.' "  Noah responded by punching the refrigerator and a table.  He then walked up to father and slapped the cell phone out of his hands.

The second video began with father stating, " 'If there is anybody.  Anybody who says they love little Noah [W.].  My disrespectful, disobedient ass son.  He needs a place to stay.' "  Noah could be seen in the background sitting on a couch.  Father explained in the video that he had contacted law enforcement to " '[w]ash his hands,' " and that Noah could no longer live under his care.  He referred to Noah as a " '[d]isrespectful ass mother fucker.' "  Father then added, " 'The fact that I am not beating his mother fucking ass right now, that is growth.  Cause I would be kicking his bitch ass face right now the disrespect I am getting.' "

On September 8, 2020, DCFS filed a dependency petition on behalf of Noah and S.W.  The petition alleged the children were at substantial risk of serious physical harm based on father's physical abuse of Noah (counts a-1, b-1, j-1), father's inability and unwillingness to provide Noah with proper care and supervision (counts b-2, j-2), father's history of abusing alcohol and marijuana (counts b-3, j-3), and mother's mental and emotional problems (counts b-4, j-4).  The petition was later amended to add a count alleging the children were at substantial risk of serious emotional damage based on father's emotional abuse of S.W. (count c-1).

At the detention hearing held on September 11, 2020, the juvenile court made prima facie findings that the children were persons described by section 300.  Noah was detained from father and placed in shelter care.  S.W. was released to father under the supervision of DCFS.  On October 23, 2020, the court granted

DCFS's request for a protective custody warrant for Noah because he had run away from his foster care placement and his whereabouts were unknown.

## II.    Jurisdiction/Disposition Report

In its November 17, 2020 jurisdiction/disposition report, DCFS stated that Noah's whereabouts were still unknown, but he kept in contact with the agency via his cell phone. S.W. was currently residing with father. When interviewed about the allegations in the petition, S.W. confirmed that the August 27, 2020 incident began because father kept yelling at S.W. and Noah told him to stop. S.W. heard screaming and the sound of objects being thrown but did not witness the fight. She later saw that Noah had scratches on his back, neck, and face. S.W. denied any prior physical abuse by father. She stated, " '[U]sually when we get yelled at, we don't say anything back but this time, Noah said something and they started arguing.' " She also noted that father called her "a little bitch" the day of the altercation with Noah. S.W. disclosed that she did not get along with Noah, and that he had pushed and hit her in the past.

In a phone interview with DCFS about the petition, Noah stated that he and father had wrestled because of an argument over how father was treating S.W. When asked if he sustained any injuries, Noah replied, " '[W]hen I wrestle with someone, nothing hurts. I black out, out of anger.' " As to prior physical discipline, Noah indicated father used a belt in the past but did not often discipline the children because they tended to stay with A.R. Noah acknowledged he had been defiant with A.R. and was told to leave her home because of his behavior. He also admitted to stealing money from her, but denied he had any physical

8

altercations with A.R. or her boyfriend. Noah preferred to stay with A.R. and did not want to be placed in foster care.

In his interview with DCFS, father indicated that he was tired of the dependency court system, and was not interested in participating in reunification services for Noah. He believed that either A.R. should have custody of Noah or the child should seek to be emancipated. In discussing Noah's behavioral issues, father reported that the child was defiant in school, was not doing well in his classes, and was repeatedly tardy. In addition to getting into fights at school, Noah had socked S.W. in the chest when they were staying with A.R., and started a fist fight with an uncle who had taken him in. Relatives who tried to help Noah by providing him with a place to stay had to call the police or tell the child to leave because of his unruly behavior.

With respect to the August 27, 2020 incident, father recounted that he became irritated with the children after picking them up from A.R.'s home because of their poor attitude. Noah got upset when he mistakenly thought father had called S.W. a bitch. S.W. started to cry and Noah would not shut up. When father told Noah to get out of his home, the child refused. As father tried to call the police, Noah took his phone and threw it. Father scuffled with Noah and held him down. After father retrieved his phone and called the police, Noah flipped over a table and punched the refrigerator. He then walked out of the home. Father did not know whether Noah had sustained any injuries. In describing the incident, father stated, " 'We didn't have a physical altercation where there was blow to blow type of action and it took everything in my body not to break every bone in his body . . . [t]hat's emotion[al] regulation 101. [I'm going to]

go to jail and do all this shit when I did nothing to this kid . . . I wish I would have broken a bone or two.' "

With respect to prior physical discipline, father reported that he hit Noah with a belt in the past because the child was coming home late and father was worried about his safety on the streets. Father stated that he rarely hit the children and knew that corporal punishment was not the best method, but he also believed that " 'sometimes a kid[ ] needs an ass whooping.' " Father had a misdemeanor conviction for willfully inflicting corporal punishment or injury on a child in connection with his inappropriate discipline of Noah in 2018.

Father admitted he regularly smoked marijuana, but stated he only did so outside the children's presence. While father had a history of abusing alcohol, he recently had completed an outpatient treatment program and reported he had been sober for one year. Both father and the children confirmed that mother had a history of mental health issues, and that she did not have contact with the children. In its report, DCFS recommended the juvenile court sustain the petition and grant reunification services to father, but not to mother.

### III. Last Minute Information for the Court

DCFS filed a series of last minute information reports for the adjudication hearing. The agency reported that, in December 2020, S.W. sent the social worker a text message that read: " 'I'm about to kill myself. I don't want to live with [father] anymore. I don't want him to have custody of me. I just live with my cousin. I want you guys to remove custody from [father]. I'm going to run away and never come back.' " After speaking to S.W., the social worker determined the child was not currently having any suicidal ideations and appeared to have sent the text in an effort

10

to get away from father. S.W. disclosed that she had been staying with A.R. and felt unwanted in father's home. When asked why she was no longer residing with father, S.W. replied that father woke her up one morning to tell her that she could not live there anymore and that she needed to pack up her belongings and go stay with A.R. Father later tried to convince S.W. to return to his home, but the child refused because he constantly yelled at her and was unable to control his anger. S.W. stated, " '[H]e yells. He makes it seem like he wishes he never had me. . . . He never hits me. It's just verbal and I don't like it.' "

In an interview with DCFS about the alleged verbal abuse, A.R. reported that S.W. had been staying with her for the past few months. When asked why S.W. left father's home, A.R. replied, "I don't want to bad-mouth [father] but basically he doesn't have control of his temper. It's loud outburst, screaming, yelling, freaking out. He posts their pictures on Facebook and embarrasses them. When he would pick them up, he would be outside my house screaming. Last time he cussed [S.W.] out from outside for twenty minutes because [S.W.] didn't want to leave with him . . . [i]t's always loud and embarrassing." On another occasion, father sent S.W. a text message stating that she could not disappoint him because he was " 'over her' " and " 'done with her.' " Both A.R. and S.W. also disclosed that father was allowing Noah to reside in his home without requiring the child to follow any rules.

On January 15, 2021, DCFS filed a first amended petition that added allegations concerning father's verbal abuse of S.W. At a January 20, 2021 detention hearing, the court detained S.W.

11

from father.  The protective custody warrant for Noah remained in full force and effect.

Father was interviewed about the allegations of verbal abuse.  He responded that he had read the amended petition and interpreted it to mean that " 'an adolescent is not getting her way.' "  When asked about the allegations that he yelled at S.W., father replied, " '[T]hat's what I do.  I do all of that.  Whatever she said, it's true.' "  While father denied that Noah was currently staying with him, he admitted that he had allowed Noah to return to his home for a period of time because the child was getting into trouble outside of his care.  Father had tried to give him more freedom, but Noah refused to cooperate or follow any rules.  Father expressed frustration that he was the only one in the family who had been making any effort.  He noted that he had completed a parenting class, an alcohol treatment program, and individual counseling.  Father told the social worker that he was done with the dependency court system and willing to relinquish his parental rights.

In March 2021, DCFS reported that the police had located Noah after responding to a call that the child was at his aunt's house and refusing to leave.  Noah was then placed in temporary shelter care but he would not stay in his placement and would come and go as he pleased.  A.R. told the social worker that, in February 2021, Noah attempted to break into her home and to fight with S.W. because he blamed S.W. that he was living on the streets.  He also reached out to father, but father would only allow Noah to return to his home if he contributed to the rent.  In addition, the social worker received information that two different groups of people were purportedly searching for Noah because he had stolen from them.  The social worker also had

been shown a video recording of Noah being assaulted by other youths. As for S.W., DCFS reported that S.W. was refusing visits with father, but maintained telephone contact with mother. Both father and mother were amenable to A.R. assuming legal guardianship of S.W.

## IV.  Jurisdiction and Disposition Hearings

The jurisdiction hearing for the children was held on April 22, 2021. The juvenile court received into evidence the reports filed by DCFS and the exhibits offered by father, which included certificates of completion for parenting education, anger management, and an outpatient treatment program. After hearing argument from counsel, the court dismissed the counts in the amended petition related to father's substance abuse, and sustained all remaining counts alleged under section 300, subdivisions (a), (b), (c), and (j). The matter was continued for a disposition hearing.

In a last minute information for the court filed for the disposition hearing, DCFS indicated that A.R. was in the process of being approved to be S.W.'s legal guardian. DCFS also reported that Noah had been arrested for attempted second degree robbery. The agency later placed Noah at a residential facility, but the child continued to leave the facility on a daily basis. Since his last placement, Noah had attempted to steal a car and told others that he was a member of a gang. DCFS continued to recommend reunification services be granted to father and denied to mother.

The disposition hearing for the children was held on July 6, 2021. Father testified that, prior to the current case, he could be aggressive with the children and his parenting style could be improved. He was concerned about the current well-being of both

13

children, particularly Noah given the child's recent criminal and gang activity. Father maintained regular communication with Noah, and he believed he could help the child stay out of trouble if Noah resided with him. Father was also concerned about S.W. because she was going into her senior year of high school and had been receiving poor grades. He acknowledged he previously had refused to participate in any further services, but stated he now believed the family could benefit from services such as counseling. Father testified he would not use physical discipline if the children were returned to his care.

After hearing argument from counsel, the juvenile court declared the children dependents of the court and removed them from parental custody. The court noted that father's position had changed throughout the proceedings and that he had shown a pattern of indecisiveness about whether he wanted the children in his care. The court stated that father was currently "on the right track," but he needed to show more sustained progress and a commitment to reunifying with the children. While denying reunification services to mother, the court granted reunification services to father, including parenting education, conjoint counseling with both children, and individual counseling to address case issues. Father was granted unmonitored visitation with the children in a public setting.

Father filed a timely notice of appeal.

## DISCUSSION

On appeal, father argues there was no substantial evidence to support the jurisdictional findings that the children were at substantial risk of serious physical harm based on his physical abuse of Noah. He specifically asserts that a single instance of wrestling with a teenage child who had challenged his father to

14

a fight is insufficient to support a finding that the child or the child's sibling is at risk of suffering serious physical harm. Based on the totality of the circumstances, we conclude that jurisdiction based on father's physical abuse was proper in this case.

## I. Standard of Review

We review challenges to the sufficiency of the evidence underlying jurisdiction findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.*, at p. 773.)

## II. Justiciability

Father solely challenges the sufficiency of the evidence supporting the jurisdictional findings based on his physical abuse of Noah (counts a-1, b-1, and j-1).[3] He does not contend the

---

[3] In arguing that the jurisdictional findings based on his physical abuse of Noah were not supported by substantial evidence, father specifically addresses the physical abuse counts sustained under section 300, subdivisions (a) and (b), but does not discuss the count sustained under subdivision (j). However, because counts a-1, b-1, and j-1 in the sustained petition were based on the same exact physical abuse allegations, we construe

15

evidence was insufficient to support the findings based on his failure to provide Noah with proper care and supervision (counts b-2 and j-2), his emotional abuse of S.W. (count c-1), or mother's mental and emotional problems (counts b-4 and j-4). As DCFS correctly asserts, a juvenile court's jurisdiction may rest on a single ground. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

A reviewing court nonetheless has discretion to consider an appeal challenging a jurisdictional finding despite the existence of an independent basis for jurisdiction when that finding "could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings," or " 'could have other consequences for [the appellant], beyond jurisdiction.' " (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763; see *In re D.P.* (Jan. 19, 2023, No. S267429) ___Cal.5th___ [p. 18].) In this case, the uncontested jurisdictional findings provide a sufficient and independent basis for the juvenile court's assertion of jurisdiction without regard to any findings related to father's physical abuse. Father argues, however, that we should address the merits of his appeal because a finding based on the physical abuse of a child

father's appeal as challenging the sufficiency of the evidence supporting each of these three counts.

16

carries a particular stigma and could be prejudicial to him in the future. Given the nature of the physical abuse allegations, we agree the challenged findings could adversely impact father in the current or future dependency proceedings. We accordingly will exercise our discretion to consider the merits of his appeal.

## III. Substantial evidence supported the jurisdictional findings based on father's physical abuse of Noah

In sustaining counts a-1, b-1, and j-1 in the amended section 300 petition, the juvenile court found that jurisdiction over the children was proper based on the following allegations of physical abuse: "On 8/27/2020, the children, [S.W.] and Noah [W.'s] father, Stephen [W.], physically abused the child, Noah[,] in that the father physically restrained the child and threw the child on to the floor, resulting in the child sustaining lacerations to the child's face and the child's body. Such physical abuse was excessive and caused the child, Noah[,] unreasonable pain and suffering. The children are prior dependents of the [j]uvenile [c]ourt due to inappropriate physical discipline by the father on Noah. Such physical abuse of the child, Noah[,] by the father endangers the child's physical health, safety and well-being, and places the child and the child's sibling, [S.W.,] at risk of serious physical harm, damage, danger and physical abuse."

Section 300, subdivision (a) provides that a child comes within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent." Section 300, subdivision (b)(1)(A) authorizes jurisdiction if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's

17

parent . . . to adequately supervise or protect the child." Under section 300, subdivision (j), jurisdiction is proper if the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." The juvenile court "may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384.)

A parent's use of inappropriate physical discipline on a child may support a finding of jurisdiction under section 300, subdivision (a), (b), and/or (j) depending on the circumstances of the case. (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1644– 1645 [jurisdiction proper under section 300, subdivision (a) where mother disciplined child with belt, cord, or ruler causing bruises, red marks, welts, and broken skin]; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438–439 [jurisdiction proper under section 300, subdivisions (a), (b), and (j) where mother punished child by striking him with belt on stomach and forearms leaving deep bruises].) In general, "[w]hether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of [the] parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' " (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.)

Viewing the evidence in the light most favorable to the juvenile court's ruling, we conclude there was substantial

evidence to support the jurisdictional findings that father's physical abuse of Noah placed both Noah and S.W. at risk of suffering serious physical harm. In contesting these findings on appeal, father seeks to characterize the August 27, 2020 altercation as an isolated incident in which he struggled to restrain Noah after the child challenged him to a fight. The record reflects, however, that father was not simply defending himself against an act of aggression by his unruly teenage son. Instead, the evidence showed that the altercation began because father had been yelling at S.W. and Noah attempted to intervene on his sister's behalf. Noah recounted that father backed him against the wall and the child responded by grabbing father's arm and swiping it away. Noah also reported that he felt father was trying to aggravate him and portray him in a negative light by recording the child with his cell phone. In the cell phone video that father posted to his Facebook account, Noah could be seen approaching father with his fists clenched and getting into a fighting stance. Rather than attempt to deescalate the situation, father responded by daring Noah to " '[h]it me if you want to. Hit me if you want to.' " Noah instead hit the refrigerator and a table before slapping the cell phone out of father's hand. According to Noah, father then grabbed him and they wrestled on the floor. While father denied hitting Noah, he admitted that he threw the child onto the floor to prevent him from leaving. He also admitted that Noah could have been injured as they were wrestling on the floor. Although it appears the child did not suffer any serious physical injuries during the altercation, he was observed to have sustained a scratch on his cheek, a small abrasion above his eyebrow, and a mark on his back.

19

Moreover, contrary to father's characterization, the August 27, 2020 altercation with Noah was not an isolated incident. In 2018, the juvenile court sustained a dependency petition filed on behalf of both children based on father's inappropriate physical discipline of Noah. In connection with the prior act of abuse, father was convicted of willfully inflicting corporal punishment or injury on a child, and he was on probation for that offense at the time of the physical abuse that resulted in this case. Father also had a pattern of being aggressive and verbally abusive to the children despite completing classes in parenting education and anger management as part of his 2018 case plan. During the pendency of the current case, S.W. disclosed that father repeatedly yelled at her, was unable to control his anger, and made the child feel unwanted in his home. The maternal cousin, A.R., similarly reported that father " 'doesn't have control of his temper,' " and that " '[i]t's loud outburst, screaming, yelling, freaking out.' " Father did not deny the allegations of verbal abuse, and instead told DCFS, " '[T]hat's what I do. I do all of that. Whatever [S.W.] said, it's true.' "

Additionally, at the time of the jurisdiction hearing in this case, father still had not accepted responsibility for his most recent altercation with Noah, but rather continued to minimize and rationalize his conduct. When DCFS interviewed father about the altercation, he expressed no remorse for engaging in a fight that had resulted in injuries to his son. Instead, he boasted about his ability to control his anger during the fight, stating, " 'I wanted to kick him in his fucking skull but I didn't.' " Father later told DCFS that " 'it took everything in my body not to break every bone in his body . . . [t]hat's emotion[al] regulation 101.' " He then added that he wished he " 'would have broken a bone or

two.' " While father acknowledged that corporal punishment was " 'not the best way,' " he maintained that " 'sometimes a kid[ ] needs an ass whopping.' " Father also repeatedly told DCFS that he was done with the dependency court system and would not agree to participate in reunification services for the children.

Relying on *In re Isabella F.* (2014) 226 Cal.App.4th 128, father argues that his physical abuse of Noah was insufficient to support a finding that the children were at risk of serious physical harm. That case, however, is distinguishable. In *Isabella F.*, a nine-year-old child suffered fingernail scratches to her face and earlobe and a small cut on her cheekbone when her mother held her down and attempted to spank her during the child's temper tantrum. (*Id.* at pp. 131–132.) While the mother claimed that any injuries to the child would have been accidental, she acknowledged she should have taken a different approach to the situation. (*Id.* at p. 132.) Shortly after the child was detained, the mother began attending anger management classes and individual therapy, and reading books on how to better deal with children who are defiant. (*Id.* at p. 133.) She also agreed to comply with any court-ordered services and to not use any form of physical punishment in the future. (*Ibid.*) Based on these facts, the appellate court concluded the evidence was insufficient to support jurisdiction over the child under section 300, subdivision (a) because the child's injuries were minor in nature and did not amount to serious physical harm. (*Id.* at p. 138.) Although the court recognized repeated instances of less serious injury can form a basis for jurisdiction, it emphasized that the altercation was "an isolated incident" and there was no evidence of any pattern of abuse. (*Id.* at p. 139.)

Here, in contrast, there was substantial evidence of a pattern of abusive conduct by father. As discussed, the August 27, 2020 altercation was not the first time father had subjected Noah to physical harm. At the time of the altercation, it had been less than a year since the juvenile court had terminated jurisdiction over the children in another case that concerned father's use of inappropriate physical discipline. Father had not shown that he gained any insight from the prior dependency case because he continued to place the blame for his abusive conduct solely on his children. While there certainly was evidence that Noah's disrespectful and defiant behavior contributed to the conflict in the home, it was father's responsibility as the parent to respond to his child's oppositional conduct in an appropriate manner. Father failed to do so, and instead responded to Noah's behavioral issues in a manner that was abusive and neglectful, and that placed both Noah and S.W. at substantial risk of serious physical harm in the future. Under these circumstances, the juvenile court's findings that the children came within the jurisdiction of the court based on father's physical abuse of Noah were supported by substantial evidence.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

RICHARDSON (ANNE K.), J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.