Filed 4/16/26  In re Jeremiah S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re JEREMIAH S., Jr., a Person Coming Under the Juvenile Court Law. | B344459 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JEREMIAH S., Sr., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP05462C) |

APPEAL from an order of the Superior Court of Los Angeles County. Sally Espinoza, Judge. Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant Jeremiah S., Sr. (Father) appeals from the juvenile court's jurisdictional finding Father's abuse of marijuana posed a risk of harm to his son Jeremiah S., Jr. (Jeremiah, born 2024) and order removing Jeremiah from his custody. (Welf. & Inst. Code, §§ 300, 361.)[1] Father argues the court's jurisdictional finding and removal order are not supported by substantial evidence.[2] We disagree and affirm.

## BACKGROUND

In November 2024, Mother gave birth to Jeremiah, and both tested positive for amphetamines. The next day, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging general neglect and sent a social worker to the hospital to investigate.

Mother admitted to the social worker she had a history of using methamphetamine, marijuana, and drinking alcohol. Mother, who was 34 years old at the time of the interview, started using drugs when she was 24 years old. She stopped when she was 26 years old after giving birth to her first child, K.M., but she relapsed due to stress. She used methamphetamine a week before giving birth to Jeremiah.

The social worker also interviewed Father. Father claimed he did not know Mother used drugs, but Father did not appear upset or surprised by the news. Father denied using methamphetamine but admitted he used marijuana daily for

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Q.W. (Mother) and half sibling K.M. (born 2017) were part of the dependency proceedings but are not involved in this appeal.

stress relief. According to Father, marijuana mellowed him down and helped him not "snap on" people. When asked about his plan to care for Jeremiah, Father replied he wanted Mother to care for him. After the social worker repeatedly explained that Mother's substance abuse might impede her ability to do that, Father maintained he wanted Mother to be the primary caregiver.

The social worker also spoke with K.M., who informed the social worker she lived with Mother, Maternal Grandmother, Maternal Uncle, and Father. Regarding Mother and Father's drug use, K.M. reported seeing them smoke a "brown drug" inside the house, in the bathroom, and near her bed.

On November 24, 2024, the juvenile court authorized DCFS to remove Jeremiah from his parents' custody, and DCFS temporarily placed him in foster care.

On November 26, 2024, DCFS filed a petition under section 300, subdivision (b)(1), seeking jurisdiction over newborn Jeremiah. The petition alleged Father's marijuana abuse rendered him incapable of providing regular care and supervision for Jeremiah.

On November 27, 2024, the juvenile court held an initial hearing. Mother represented to the court she did not object to the detention order because she planned to enter a rehabilitation program. Father requested that once Mother entered a program, DCFS assess release of Jeremiah to him. Father also agreed to drug testing. The court then made detention orders as to both parents. Among other things, the court ordered Father to take weekly drug tests. Father missed the first test. According to Father, he forgot about the test after he had a disagreement with Mother.

3

On January 30, 2025, the social worker interviewed Father for the jurisdictional and dispositional report while he was in custody for violating parole. Father represented he had stopped smoking marijuana since his arrest and promised to stop smoking since Jeremiah needed him. Father was released from jail on February 3, 2025, and moved back in with Mother. On February 11, 2025, Father tested positive for marijuana.

On February 20, 2025, the juvenile court held a jurisdictional and dispositional hearing. The court sustained the section 300 petition, finding true the allegations against Father. The court then removed Jeremiah from the custody of his parents, placed him in foster care, and ordered DCFS to provide reunification services. The court ordered Father to a full drug and alcohol program with aftercare, random and on-demand drug and alcohol testing on a weekly basis, and a developmentally appropriate parenting program.

Father timely appealed.

## DISCUSSION

## I. Substantial Evidence Supports the Juvenile Court's Jurisdictional Finding as to Father

### A. We Consider Father's Challenge to the Juvenile Court's Jurisdictional Finding

At the outset, we note even if Father prevails on appeal, the juvenile court will still have jurisdiction over Jeremiah because the court also made findings against Mother which are unchallenged on appeal. Thus, we need not consider Father's jurisdictional challenge. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) However, we will exercise our discretion to consider it. (*In re D.P.* (2023) 14 Cal.5th 266, 285 ["Courts may consider whether the challenged jurisdictional finding 'could be prejudicial

4

to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction." ' "].)

**B.      Applicable Law and Standard of Review**

Under subdivision (b)(1) of section 300, the juvenile court may assert jurisdiction over any child who has suffered, or who is at substantial risk of suffering, serious physical harm or illness because of "[t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" or "[t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (*Id.,* subd. (b)(1)(A), (D).) A jurisdictional finding under subdivision (b)(1)(D), requires evidence that "(1) substance abuse (2) makes a parent or guardian unable to provide regular care for a child and (3) this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 558 (*N.R.*).)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602.) Further, "the court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' " (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*Ibid.*) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*Ibid.*)

C.    **Analysis**

Here, substantial evidence supports the juvenile court's finding there is substantial risk of harm to Jeremiah arising from Father's marijuana abuse.

Father admitted to using marijuana daily. Although Father argues the record does not show how much he used or whether the use amounted to substance abuse, he admitted he depended on marijuana to cope with the stressors of life. He also needed marijuana to mellow him down and help him not "snap on" people.

Further, Father's failed court-ordered drug tests show he struggled with quitting marijuana. Regarding the first failed test, Father said he missed it because he forgot about it after having a disagreement with Mother. The juvenile court was free to discount this explanation. Without an adequate explanation, a missed drug test may be "properly considered the equivalent of a positive test result." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1385, disapproved on other grounds by *N.R.*, *supra*, 15 Cal.5th at p. 560, fn. 18.) As for the second failed test, this occurred after Father told a social worker 11 days prior he would

6

give up marijuana to care for Jeremiah. Father makes much of the fact DCFS never refuted his assertion below that this failed test was positive only at a low level. He also points out DCFS never elaborated on the failed test's significance. Even so, the court could have reasonably concluded Father was unable to curtail his marijuana abuse despite being ordered by the court to undergo testing and acknowledging he needed to quit to support Jeremiah.

Father correctly asserts marijuana use, "without more," does not bring a minor within the jurisdiction of the dependency court. (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1001–1003.) But in the cases Father cites to support his position, there was no evidence the parents' substance abuse affected their ability to care for their children. For example, in *Destiny S.*, there was no evidence the child, who was well cared-for was at risk of suffering physical harm as the result of the mother's use of illegal drugs. (*Ibid.*) Similarly, in *In re David M.* (2005) 134 Cal.App.4th 822, 824, 830, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628–629 (*R.T.*), there was no evidence the children, who were healthy, well cared-for, and loved were at risk of suffering physical harm as the result of the mother's substance abuse. The record here is different.

Under the circumstances of this case, the juvenile court could have reasonably inferred Father's admitted regular use of marijuana rendered him unable to adequately care for Jeremiah. Father resided with Mother, who had struggled with substance abuse for 10 years, and used marijuana with her. Although Father claimed he did not know she abused drugs, the social worker observed he did not appear upset or surprised when confronted with her drug abuse. From this evidence, the court

7

could have reasonably found Father either knew of Mother's drug abuse, did not care she abused drugs, or was so consumed by his own marijuana use that he was unable to detect her drug abuse. Whatever the case may be, the court could have reasonably concluded Father's marijuana abuse contributed to creating an environment where Mother's drug abuse could continue unabated and ultimately harmed Jeremiah. As noted, Mother used methamphetamine a week before giving birth to Jeremiah, and he tested positive for amphetamines upon birth.

Further, not only did Father and Mother smoke in the house, but they also smoked in K.M.'s room and near her bed. The juvenile court could have reasonably concluded Father would have similarly exposed Jeremiah to marijuana smoke. To downplay this fact, Father points out that in one of K.M.'s interviews, she described what Father and Mother smoked as cigarettes. From this, Father argues the record at best establishes they smoked tobacco cigarettes inside the house. Our task is to view the evidence in the light most favorable to the court's finding, not Father. (*R.T.*, *supra*, 3 Cal.5th at p. 633.) Although K.M. described what they smoked as cigarettes, nothing compelled the court to accept the "brown drug" they smoked was tobacco.

Father also points out much of the evidence focused on Mother's drug abuse and suggests her drug abuse is irrelevant to his ability to care for Jeremiah. But given Mother's severe substance abuse problems, Jeremiah needed Father to step up as the sober parent to provide stability. Father acknowledged Jeremiah needed him to do so, yet he still could not give up marijuana. Mother's drug abuse was also relevant because Father designated her as the primary caregiver even after

8

purportedly discovering Mother's drug abuse at the hospital. Father maintained this view even after the social worker repeatedly explained to him that Mother's substance abuse issues would not allow her to fulfill that role. Father did not offer or request to be Jeremiah's primary caretaker at that time. In light of evidence Father knowingly designated an unfit parent as Jeremiah's primary caregiver, the juvenile court could have reasonably concluded Father was also unfit or unable to care for Jeremiah.

Jeremiah's tender age also supported the juvenile court's finding. (*N.R.*, *supra*, 15 Cal.5th at p. 559 ["[A] child's youth and maturity level can bear upon the care that the child may require and whether a parent's . . . substance abuse places the child at substantial risk of serious physical harm."].) Jeremiah was only three months old at the time of the February 2025 adjudication hearing. He required constant care and vigilant supervision, and particularly depended on his caregivers to prevent injury, respond to emergencies, and manage behavioral needs. The court could have reasonably concluded Father's admission to using marijuana daily and intent to delegate primary caregiving responsibilities to Mother, who had severe substances abuse issues of her own, created a substantial risk Father would be unable to provide the level of supervision and care the vulnerable Jeremiah required. And the court reasonably provided a case plan and reunification services to Father so Jeremiah could be eventually returned to his custody.

In short, substantial evidence supports the juvenile court's determination Jeremiah was at risk of harm due to Father's substance abuse.

## II. Substantial Evidence Supports the Juvenile Court's Finding There Existed a Substantial Danger to Jeremiah if Placed in Father's Custody

### A. Applicable Law and Standard of Review

In pertinent part, section 361 provides "[a] dependent child shall not be taken from the physical custody of their parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (*Id.,* subd. (c)(1).)

A removal order is proper if based on proof of parental inability to properly care for the child and of a potential detriment to the child; however, the parent need not be dangerous, and the minor need not actually be harmed before removal is appropriate. (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170.) " 'Reasonable apprehension stands as an accepted basis for the exercise of state power.' " (*In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

We review a dispositional order removing a minor from parental custody for substantial evidence. (*V.L.*, *supra*, 54 Cal.App.5th at p. 154.) Because the juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof (§ 361, subd. (c)), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011).

**B.     Analysis**

The same evidence that supports the juvenile court's exercise of dependency jurisdiction also constitutes substantial evidence from which the court could find it highly probable that Jeremiah would be at risk of substantial danger if he was returned to Father. Father repeats the arguments he made challenging the court's jurisdictional finding but these arguments do not compel a different result. Father fails to show error in the court's conclusion that removal was necessary to protect Jeremiah.

**DISPOSITION**

The juvenile court's jurisdictional finding as to Father and removal order are affirmed.

RICHARDSON, J.

WE CONCUR:

CHAVEZ, Acting P. J.     GOORVITCH, J.*

---

*        Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11